PAUL J. KING v. THE FORD RIVER LUMBER COMPANY.

*Master and servant—Dangerous machinery—Injury to infant— Assumption of risk—Credibility of witness.*

1. There is no rule of law which prevents a jury from believing what a witness says upon the stand, because he may at other times have made statements inconsistent with his testimony.

2. A master is liable for injuries to his servant, resulting from the master's negligence in exposing the servant to dangers which the servant is incapable of appreciating; citing *Railway Co. v. Bayfield,* 37 Mich. 205,

3. When the servant shows that the injury received was in consequence of a risk not ordinarily incident to the employment,

growing out of the master's negligence, the burden is upon the master to show that the servant knew and understood the increased danger; citing *Swoboda v. Ward,* 40 Mich. 423.

4. An employé, by reason of youth or inexperience, may not understand and appreciate a danger to which he is exposed, although the place and the dangerous machinery are open to observation. In one case, it may be due care to inform a servant of mature years and experience of the danger which he must guard against; while in the case of an infant, or one not of mature age, and without experience, it would be carelessness in a master to content himself with merely pointing out dangers which are not likely to be appreciated; citing Cooley, Torts, 553.

5. A party entering upon a particular employment assumes the risk and perils usual thereto, when the usual and customary means to guard against accidents are adopted. If the servant, with full knowledge of the danger, and understanding the increased risk occasioned thereby, consents to enter into the employment, he voluntarily incurs the risk, and, if he suffers damages in consequence of injury received thereby, he will be without remedy. The fact that he remains in the master's employment under such circumstances, and with such knowledge, is what constitutes contributory negligence on his part. In such a case, the master, in permitting his machinery to be thus more than ordinarily dangerous, is guilty of negligence; but the servant, with full knowledge thereof, by remaining, contributes thereto, and hence he cannot recover if he has such knowledge.

Error to Delta. (Stone, J.) Argued June 23, 1892. Decided October 4, 1892.

Negligence case. Defendant brings error. Affirmed. The facts are stated in the opinion.

*Ball & Hanscom* and *A. R. Northup,* for appellant, contended:

1. There was no negligence in omitting to fence off or box the shaft; citing *Sjogren v. Hall,* 53 Mich. 277; *Schroeder v. Car Co.,* 56 Id. 132; *McGinnis v. Bridge Co.,* 49 Id. 471.

2. The cause and manner of the injury, as alleged in the declaration and testified to by the plaintiff, was, in the nature of things, impossible.

3. The jury should have been instructed that whether the plaintiff was warned of the danger or not was immaterial; citing *Prentiss v. Furniture Co.*, 63 Mich. 481.

4. The charge assumes that there was evidence tending to show that the injury received was in consequence of a risk not ordinarily incident to the employment. There was no such evidence. Whatever danger there was, was incident to the employment. The plaintiff does not claim to have been set or ordered to do something he was not hired to do. Besides, it was error to say that in such case the burden was on the defendant to show that the plaintiff "knew and understood the increased danger." The burden is on the plaintiff to prove his whole case, and absence of negligence on his part and want of knowledge is a part of his case; citing *Daniels v. Clegg*, 28 Mich. 37; *Guggenheim v. Railway Co.*, 66 Id. 159.

5. The testimony of witnesses stating their opinion that the place where the plaintiff worked was a dangerous place in which to work was inadmissible; citing *Lemon v. Railway Co.*, 59 Mich. 623; *Anderson v. Boom Co.*, 61 Id. 494; *Harris v. Township of Clinton*, 64 Id. 457; *Kelley v. Town of Fond du Lac*, 31 Wis. 185, 186; *Ryerson v. Abington*, 102 Mass. 531; and there is a clear distinction between the cases cited and *Huizega v. Lumber Co.*, 51 Mich. 272; *Laughlin v. Railway Co.*, 62 Id. 220; *Cross v. Railway Co.*, 69 Id. 363.

*George Gallup*, for plaintiff.

McGRATH, J.   Plaintiff had judgment against the owners of a saw-mill, for injuries received by him while at work near a revolving shaft, being thrown against it, his arm taken off, and otherwise severely injured.

The rough sketch on next page will aid in the description of the place of the injury.

The conductor is a trough 14 or 15 inches deep, 28 inches wide at the bottom, and 40 inches wide at the top.   Along the bottom an endless chain operates a conveyor, which carries the slabs and mill refuse out of the mill to the burner. The large chute, A, leads to the floor above at an angle of 45 deg., through which coarse slabs, cut to lath lengths, are discharged into the conductor.   The chute B brings the refuse from the lath-mill, strikes the conductor at right angles, is about 12 inches wide, and is located about one foot from the

lower end of chute A. The chute C brings other refuse, is about 20 inches wide, and strikes the conductor at right angles on the opposite side from chute B, and about three and one-half feet from the lower end of A. These chutes are all smallest at the lower end. D is a shaft two inches in diameter, crossing the conductor, and E represents a section of the pulley, which is about 36 inches from the conductor, and over which runs the belt which operates the shaft, D. F represents a platform, which plaintiff says was composed of

two 2x8 planks, while the employé who built it says it was composed of two planks 2x10 or 2x12. There is a key-seat half an inch wide, and 3.32 of an inch deep, in the shaft, which extends out 28 inches towards the conductor. This key-seat is a groove in the shaft, through which the key which fastens the pulley to the shaft is driven. The key was a piece of half-inch iron, which, when in place, extended outwards 2½ inches beyond the inner face of the pulley. The shaft is about 8 feet 5 inches above the mill floor, about 34 inches above the platform, and 14 inches above the sides of the con-

ductor. The platform is about 4 feet 3 inches above the mill floor. The distance between the chute B and the shaft is 5 feet 2 inches. The shaft, pulley, and belting were uncovered, and the shaft makes 144 revolutions each minute.

This plaintiff, then 13 years of age, was set at work on the platform, F. His duty was to keep these three chutes clear while the mill was in operation. To do this, he was provided with a pike-pole 6 feet long, and a hook, with which he pulled or pried out the refuse as it clogged in the chute. The boy was employed May 1, having had no experience at such work. He was the first person set at this job, and was at first placed on the other side of the conductor, without any platform, but, as he says, he could not then reach his work. In the course of a day or two the platform, F, was erected, and he was stationed on the platform to do this 'work. The trial was had some four years after the injury. He says, in substance:

"I was set to work to keep slabs from clogging in the big box, to keep the conveyor clean. To keep these slabs moving, I was furnished with a six-foot pole with a pike in the end. While engaged in this work, I had to stand upon two eight-inch planks. I was not informed by them concerning taking care of myself, and I did not at the time that I commenced work there, and during the time I was working there, know that I was in any danger. The slabs and refuse which came into the conveyor from the chutes sometimes clogged, and it was my duty to unfasten them. To do this, I took a pike-pole and loosened them. I stuck in the pike-pole, and pulled them down.

"I was working as usual, and trying to keep those slabs from clogging up there, and I put up my pole the first time to unfasten them, and they would not come down. I stuck my pole into the slabs, when another slab from above struck my pole, and the pole struck my breast, and shoved me back against the pulley, and partly off the platform, and, in trying to save myself, I reached out, and my hand became caught, and that is all I know of it. I could not say how my hand got caught,—whether I reached over or under. I have no memory of it. I had an arm taken off about two inches above the elbow, and had it amputated at the shoulder, and broke

my heels and bruised my back, and my head was hit on the left side. It took the arm off my body, injured both feet,— the left one the worst; the bones in that foot were broken.

"While I stood on that platform, I was about half way part of the time, to keep the little one clear, and then I had to go right alongside. There was the other chute, and I had to keep that clear. To keep the slabs clear at the big chute, I stood pretty near the little chute,—right by the side of it.

"At the time I got hurt, the slabs clogged up in the big chute a little more than half way up from the bottom, when the slabs started suddenly, and slid down the chute. There was some slabs from above that caused them to start, and they slid down. I cannot tell how big a pile there was. They lay angling across. The corners would catch on each side of the box. What I wanted to do was to pull one end out so they would slide down. When the slabs started, the pike-pole did not hit me. It shoved me; struck me in the breast; shoved me backwards. When I put the pike-pole up there, I did not have it against my breast. I had the end in my hands, reaching out, and, when the slabs started to shove the pike-pole against me, I was then facing right towards the big chute, so that it shoved me backwards to the pulley, partly off the platform. If the platform was wider, I think I should have been all right. I could not step out of the way. I could not get the pike-pole away from in front of me; it would shove me off the platform. I could not get away from before it. When I shoved the pike into the slabs, and they came down and pushed me onto the shaft, I was facing towards the big chute. My side was partly towards the shaft. It pushed me backwards right against the pulley. I could not fall off the platform. It partly pushed me off the platform in going back. The platform was not wide enough. If it was not for the wheel, I would have fallen to the floor. I fell against the pulley. It pushed me back against the pulley. I was on my feet all the time. It just kept me walking back before the pike, until I got against the pulley. It shoved my breast. I didn't exactly fall. I could not tell where my hand struck. I tried to save myself, and my hand got on the shaft or some place. I cannot remember that. I did not catch hold of anything, as I remember. I did not know what my hand struck. I could not say whether I went over the shaft. I never measured the

planks.    When I fell against the pulley, the pulley kept me from falling off the platform as long as the shaft did not catch my hand.    I suppose, when my hand got caught, my clothes wound me up, and kept me from falling.    The pulley was going around towards me.    When I reached up to pull down the slabs with the pike-pole, I handled it with both hands, and had hold clear out to the end; reaching out with both hands as far as I could."

The boy was picked up on the mill floor, six or seven feet from the shaft.    He had evidently been whirled into the air with the shaft, and thrown where found.    His arm was found around the shaft.    The bones in one of his feet were broken, and the 2x6 piece that supported the floor of the platform was broken, indicating that, in being carried with the shaft, his feet had struck and broken down the platform.

Defendant insists:

1.  That a verdict for defendant should have been directed; that there was no evidence of negligence on the part of defendant; that there was no negligence in omitting to fence off or box the shaft; that plaintiff had admitted to several witnesses that he was hurt by hanging with his arm over the shaft.

2.  That expert and opinion evidence was admitted as to the dangerous character of the place.

3.  That one witness was permitted to testify that, in his judgment, the shaft ought to have been covered.

In the view which we take, it is unnecessary to discuss the questions separately.    No witness questioned the danger of sudden or accidental contact with a shaft making 72 to 144 revolutions per minute.    The foreman who placed the boy at work says:

"I told him there was a shaft, and he wanted to look out for it.    I did not think there was any danger.    I knew there was no danger if he kept away from it.    I was around there occasionally, where he was at work, before he got hurt. When I went there one day, I found him with a string, hitching it on the shaft, and seeing it wind up there.    I told him I wanted him to keep those strings off.    If he did not, I said, the first thing he would know he would get wound up,

and I said, 'If you ever get caught on the shaft, it will be hard for you.'"

The assistant superintendent of the mill says that he found the boy at one time with his arm around the shaft, and said to him:

"My boy, you keep away from the shaft; you will get hurt the first thing you know, and, if you got wound around that shaft, you will get killed."

The witnesses all say that, if one's clothes got caught on the shaft, it would be likely to wind him up, and all, in fact, insist that throwing an arm about it would be likely to produce the result here produced.

This boy, 13 years of age, was placed upon a narrow platform, elevated over four feet from the floor, and charged with the duty of keeping these three chutes clear. With a hook or pike-pole six feet long, he was expected to pry, push, and pull the clogged slabs so as to loosen them. When at work releasing the slabs in the chute A, if he stood close up to chute B, his left side would be within four feet of this revolving shaft. He would naturally have to stand facing the chute, with his back to the shaft, and within a less distance from the shaft. If he pulled either with hook or pike-pole, he would pull towards the shaft. If he was pushed by a sudden giving way of the clogged slabs, he would be pushed towards the shaft. If he pulled with hook or pike-pole, and the hook or pole gave way, he would be thrown towards the shaft. A boy of 13 would be more likely to be pushed or thrown than one of more mature years. He would be more easily pushed, and would be more likely to be exerting more strength in proportion to what he had, if pulling upon hook or pole, and the giving way of hook or pole would be more likely to throw him off his balance.

There is a difference between working with or at a piece of machinery and being engaged in other work in close proxim-

ity to such machinery. In the one case, attention is naturally directed to the machinery; and in the other, attention is directed to the work, and not to the machinery, and the more attention is given to the work the less must necessarily be given to the machinery. Take the present case. Slabs were clogged, and were collecting in this chute. The boy had not control of the work, but the work was driving him. To what would his attention be naturally directed, and what would naturally challenge his entire attention, if not the clogged chute? If, from the nature of this boy's work, he was liable to be thrown against this shaft, sudden contact with which was dangerous, can there be any question but that the place was one of danger? There was testimony tending to show that shafting like this was not usually covered; but the necessity for covering any dangerous machinery arises from the probability of contact with it, from its proximity to persons engaged at work in its vicinity. This shafting was eight feet and five inches from the mill floor. Independent of the fact that this conductor and these chutes and this platform had been constructed there, and this boy placed at work beside this shaft, it would have been entirely unnecessary to cover or guard it. If this boy was likely to be thrown against this shaft, and, being thrown against it, would be likely to have his clothes caught or to clutch it, is there any question but that it should have been guarded or covered so as to prevent just those consequences? Can it be said not to be dangerous, because he ought not to have or might not have clutched it, or his clothes might not have caught?

With reference to the admissions, although plaintiff had not expressly denied them, they were in conflict with his testimony given upon the trial. The court fairly submitted that question to the jury, giving several requests, and all of the requests submitted by defendant relating specifically to plaintiff's admissions. No one saw the accident. The first word said to the boy when he was found upon the floor, his arm torn

from the body, and wound around the shaft, was by the assistant superintendent, who said:

"If you had done as I told you, and attended to your business and kept off the shaft, you would not be in this shape."

The wife of the mill foreman says that he told her within a short time after the accident, an hour before the doctors arrived, that he had his arm around the shaft, and showed her how he did it, and she says he told her so repeatedly. Another witness says that the next summer after the accident plaintiff was around begging for assistance, and witness told him that if he had done as Jule told him he would be all right, and would not need the subscription paper; and the boy replied:

"Yes, he would; if he had done as Jule told him, and not been hanging on the shaft, he would not have been hurt."

This witness, when asked from what source he received his first information that the boy got hurt by putting his arm over the shaft, replied:

"The men standing around him there at the time of the injury. I asked what was the matter. They said the boy had been hanging on the shaft, and got his arm torn off."

Conceding that these statements had been made by plaintiff, they went to his credibility, and it was for the jury to determine that question. It was for the jury to consider under what circumstances they were made; what plaintiff's condition then was; whether what he said when appealing for alms, in answer to a charge made, ought to have any weight. There is no rule of law which prevents a jury from believing what a witness says upon the stand, because he may at other times have made statements inconsistent with his testimony.

It is clear that, upon the question of defendant's negligence, the dangerous character of the machinery and of the place, and the duty of defendant to have guarded plaintiff against the danger, plaintiff was entitled to have the jury instructed that, unless plaintiff understood and assumed the

danger or risk, then defendant was guilty of negligence; that it was its duty to have covered or guarded this machinery; and that, if they believed that plaintiff, while in the performance of the work assigned to him, received the injury in the manner detailed by him, while in the exercise of reasonable care, he was entitled to recover. No amount of expert or opinion evidence, as to whether the place was a dangerous place, or as to whether the shaft should have been boxed, could have affected the result or prejudiced defendant.

It is next insisted that the court erred in instructing the jury that—

"If you find that the place was dangerous, and that the defendant knew, or had reason to know, the peril to which plaintiff would be exposed, and did not give him sufficient or reasonable notice of it, and if he, without any negligence on his part, from youth or inexperience, failed to perceive or appreciate the danger, and was injured in consequence, the defendant is responsible to him, in an action, for such damages as you shall find he has sustained by reason of the injury, under the charge."

If plaintiff fully understood or was informed by defendant of the dangerous character of the shafting, and of his liability to fall upon it and become caught and injured by it, and appreciated that danger, he might be held to have assumed the risk.

The court further instructed the jury that—

"A party entering upon a particular employment assumes the risk and perils usual thereto, when the usual and customary means to guard against accidents are adopted. If the servant, with full knowledge of the danger, and understanding the increased risk occasioned thereby, consents to enter into the employment, then he voluntarily incurs the risk, and, if he suffers damages in consequence of injury received thereby, he will be without remedy. The fact that he remains in the master's employment under such circumstances, and with such knowledge, is what constitutes contributory negligence on his part. In such a case, the master, in permitting his machinery to be thus more than ordinarily dangerous, is guilty of negligence; but the servant, with full

knowledge thereof, by remaining, contributes thereto, and hence he cannot recover if he has such knowledge."

These instructions were without error.

It is next urged that the court assumed that the risk to which plaintiff was exposed was not one incident to his employment, in the instruction given to the jury that,—

"When the servant shows that the injury received was in consequence of a risk not ordinarily incident to the employment, growing out of the master's negligence, the burden is then upon the master to show the servant knew and understood the increased danger."

The court followed almost *verbatim* the rule laid down in *Swoboda v. Ward*, 40 Mich. 423, and the instruction was correct.

The court further instructed the jury as follows:

"Had the plaintiff been warned to keep away from the shaft, and of its dangerous nature when running? If he was notified of the danger, did he comprehend and understand it? If so, he cannot recover. In determining whether he understood the warning, if given, you may consider the plaintiff's age at the time, his intelligence, his experience or want of experience, and such like. In other words, you may consider these circumstances to enable you to ascertain and determine whether he fully understood and appreciated the danger. If such warning was given, and he understood it, and continued to work there after such knowledge, he cannot recover in this action."

This instruction was clearly correct. A master is liable for injuries to his servant, resulting from the master's negligence in exposing the servant to dangers which the servant is incapable of appreciating. *Chicago & Northwestern Ry. Co. v. Bayfield*, 37 Mich. 205.

An employé, by reason of youth or inexperience, may not understand and appreciate a danger to which he is exposed, although the place and the dangerous machinery are open to observation. In one case, it may be due care to inform a servant of mature years and experience of the danger which

he must guard against; while in the case of an infant, or one not of mature age, and without experience, it would be carelessness in a master to content himself with merely pointing out dangers which are not likely to be appreciated. Cooley, Torts, 553.

In *Coombs v. Cordage Co.*, 102 Mass. 572, 596, Gray, J., declares the rule to be that the notice which the master gives to the servant must be such as to enable a person of his youth and inexperience to appreciate the nature of the danger. In determining the question, it is proper and necessary to take into consideration, not only the plaintiff's youth and inexperience, but also the nature of the service, and the degree to which his attention while at work would need to be devoted to its performance.

"Mere information in advance that the service generally, or a particular thing connected with it, was dangerous, might give him no adequate notice or understanding of the kind and degree of the danger which would necessarily attend the actual performance of his work."

The judgment is affirmed, with costs to plaintiff.

The other Justices concurred.