140   401
j142  ⁸180
140   401
146¹¹575
140   401
147  ¹466
148  ⁸649
140   401
f151  ⁸ 20
140   401
152  ²420
152  ¹¹478
140   401
155  ¹¹494

## McDONALD v. CHAMPION IRON & STEEL CO.[1]

1. **MASTER AND SERVANT — INJURIES TO SERVANT — ASSUMPTION OF RISK.**

   The principle of assumed risk rests upon the implied contract that the servant shall assume the risk of all dangers obviously incident to his employment, but the doctrine applies only to those dangers which the servant either actually knows or should know.

2. **SAME—DUTY TO INSTRUCT—YOUTHFUL EMPLOYÉ.**

   Where an infant servant is injured, his age and experience and the necessity of instructions are to be considered in determining whether or not he assumed the risk.

3. **SAME—BURDEN OF PROOF.**

   Where a servant is injured in consequence of a risk not ordinarily incident to the employment, growing out of the master's negligence, the burden is upon the master to show that the servant knew and understood the increased danger.

4. **SAME—QUESTION FOR JURY.**

   Where a boy of 14, employed to remove the scrap metal from shearing machines, was injured in consequence of the master allowing a passageway behind the machine to become blocked with scrap over which the boy had to pass in performing his duty, the question whether he knew or should have known the danger which confronted him, and assumed the risk, *held*, under the circumstances, to be for the jury.

5. **SAME—DUTY OF MASTER.**

   Where boys were employed to remove the scrap metal from shearing machines, and set to work in a narrow passage in which there were gear wheels and other machinery so situated that as long as they stood upon the floor they were in little or no danger from the machinery, but should the scrap accumulate on the floor then increased altitude would subject them to danger, it was the master's duty to take reasonable precautions to keep the passageway clear, and to that end to give instructions to the boys before setting them to work.

[1]Rehearing denied October 2, 1905.

6. SAME—EVIDENCE—SUFFICIENCY.

Evidence examined, and *held*, that the jury were warranted in finding that the master had not discharged his duty in that regard.

7. SAME—FELLOW-SERVANTS.

Where the master's duty to instruct servants is committed to a foreman, the master is bound by the instructions he gives.

8. SAVING QUESTIONS FOR REVIEW—EXCESSIVENESS OF VERDICT —NECESSITY OF MOTION FOR NEW TRIAL.

In an action by a parent for the death of a child, in which the measure and data for computation of damages is fixed by law, error may be assigned on a clearly excessive verdict, as on one not supported by the evidence, without a motion for a new trial.

9. NEGLIGENCE — EVIDENCE — INCOMPETENT MATTERS — PREJUDICIAL ERROR.

In an action for the death of a servant, incompetent evidence as to changes in machinery ordered by the factory inspector after the accident, and as to the composition of a certain "trust," will be deemed prejudicial where the verdict rendered was grossly excessive.

10. TRIAL—ARGUMENT OF COUNSEL—PREJUDICE.

In an action by a parent for the death of a child, statements by plaintiff's attorney in argument as to the suffering, agony, and pain occasioned to the father and mother by the child's death, and as to how much the jurors would take to have a boy killed under similar circumstances, were prejudicial, and should have been suppressed by the court, whether objected to by opposing counsel or not.

11. DEATH—DAMAGES—INFANT—EXCESSIVENESS.

In an action by a parent for the death of a child, it appearing that the boy was 14 years of age, was earning 75 cents per day, while an older brother earned 85 cents to $1.25, and his father $1.75, in the same employment, and that it cost the entire 75 cents to take care of the boy who was killed, a verdict for $7,487 was excessive, and, the plaintiff so requesting, the judgment thereon would be reduced to $2,500 as a condition of its affirmance.

Error to Muskegon; Russell, J. Submitted January 6, 1905. (Docket No. 21.) Decided June 8, 1905.

Case by William McDonald, administrator of the estate of Patrick McDonald, deceased, against the Champion Iron & Steel Company for the negligent killing of plaintiff's intestate. There was judgment for plaintiff, and defendant brings error. Affirmed on condition.

*Keena & Lightner*, for appellant.

*James E. Sullivan* and *Chamberlain & Walker*, for appellee.

BLAIR, J. Patrick McDonald, son of the plaintiff, William McDonald, was killed at defendant's Iron & Steel Works in the city of Muskegon between 2 and 3 o'clock in the afternoon of April 2, 1902, and plaintiff, as administrator, brought this action against the defendant in the Muskegon circuit court to recover damages for such death, being the financial loss suffered by the father and mother by reason of being deprived of the boy's earnings during his minority, namely, from his fourteenth to his twenty-first year.

Theodore D. Morgan was at the time of the injury the general manager of defendant's plant, and John C. Williams was superintendent of the inside work under Mr. Morgan. There were a number of departments in defendant's plant. The place where Patrick was killed was in the shearing department, where the sheets were squared up and trimmed for tinning. This particular shearing room was in charge of a foreman named John Points, who worked under Williams' general direction, and had under his immediate direction from 30 to 50 men, including shearmen, scrap boys, and openers. There were some five sets of shears in the department, three sets of which were small shears, and were in a large outer room, and two sets of which, called the "big shears," were in a small room by themselves, which opened out, however, into the large room. These large shearing machines extended lengthwise east and west up to a wall at the west end of the west machine. The fronts of the machines were towards the north, where

the shearmen stood and operated the machines by means of treadles. The backs of the machines were towards the south, and here the scrap boys stood and collected the scrap as it fell from the machines in the process of trimming the plates. Some six or seven feet to the south of the backs of the machines was a corrugated iron partition. The frames of the machines were some 10 or 12 feet in length, and the scrap boys at these machines therefore were required to perform their duties in a space bounded by the machines, the west wall, and the south partition, of from 20 to 24 feet in length and 6 or 7 feet in width, with an open space at the east end only, leading out into the outer room. The gearing of the big shears was upon a rapidly revolving shaft, to which power was transmitted from line shafting above, and upon the shaft was a cogwheel meshing at the top into a cogwheel on another shaft further in from the perpendicular face of the machine. These shaftings work in such direction that the teeth of the cogwheels meet at the top and separate below. The shaft is about five feet above the floor. One Harry French was the scrap boy employed at the outer, or east, machine, and Patrick McDonald, the decedent, was employed at the west, or inner, machine. The shearman's duty was to take a package of sheets of iron, and, placing them upon the bed of the shearing machine, trim the edges. The scrap boy's duty was to stand at the back of the machine where the scrap would fall from this work, collect it with tongs as it fell, tie it into bundles, called "fagots," and throw or pile it behind him. A man by the name of John O'Donnell was employed by defendant to remove these fagots upon a truck to a car outside of the building, whence it was hauled away.

Patrick McDonald went to work as a scrap boy some time in February, 1902, and had worked continuously in such employment until the day of his death. He became 14 years of age on the 11th day of March, 1902, and up to the day of his death he always worked upon the smaller shearing machines, which had no walls or partitions back

of them, and where the scrap, as collected by the boys, was piled upon trucks, and not upon the floor. About 12 o'clock on the day in question, Patrick, with his shearman, began work on the inner, or west, shearing machine, and French, with his shearman, began work at the same time upon the east, or outer, machine. According to the general manager, Morgan, each one of these machines would "probably accumulate a fagot every five minutes or so, when they were working full; something like that." In the performance of their work the boys took the scrap, which would be in various lengths, according to the length of the plate, " some eight, and some six, and some seven, all lengths, some wider and some narrower," and doubled them up in bundles or fagots about 2½ feet long, and weighing from 50 to 100 pounds, tied them with wire, and piled them in rows against the corrugated iron partition the full length of the machines and across from the wall to the shear frame just under the gearing. The boys proceeded with their work for something over two hours or thereabouts, when McDonald's shearman, having finished his work, left the machine to work elsewhere in the department. The method of the work in the department required that each scrap boy should follow his particular shearman about the department. Patrick, having finished his work soon after the shearman left the machine, started to go out from behind the machines, going toward the east, the only way in which he could get out. When Patrick started to go out to follow his shearman, there were three rows of these fagots piled lengthwise against the partition, the fagots being some 2½ feet in length and 10 inches in diameter, so that they took up about half the space between the backs of the machines and the partition. At the point opposite the cogwheel and gearing the fagots extended from the partition clear up to the machine under the cogs and gearing, and the pile was at this point about three feet wide and 2½ to 3 feet high. It was necessary for Patrick to climb over this pile of fagots in order to get out. French saw him start to come out, then turned to pull

some scrap away from his machine, heard a noise, looked up, and saw Patrick falling to the floor.

"His arm was tore off. You could see on his shirt afterwards. You could see where the cogs had run up his shirt. There was nothing there besides those cogs that could have caught him. The scrap itself was piled in the space under the gearing."

This was the first time that Patrick McDonald had ever worked upon these big shears, and no instructions were given him at any time, so far as the record discloses. The foreman, Points, instructed French the first day he went to work in the mill how to bundle up the scrap and where to throw it, and told him to pile the fagots against the partition, and this seems to have been the company's method in the operation of these machines, so far as the scrap boys were concerned, as shown by the testimony of Mr. Morgan, the general manager.

The plaintiff claims that the defendant failed in its legal duty to provide and maintain a safe place for the deceased boy to work in, in this: That the space provided was so confined that the usual and required method of doing the work might reasonably be expected to result in the piling of scrap across the passageway near the cogwheels, and thereby expose the scrap boy at the west machine to serious peril in endeavoring to leave the machine, and defendant did not make adequate provisions for the removal of the scrap, but permitted its accumulation. The circuit judge submitted the case to the jury upon this theory. Defendant's counsel contend that this was error for the reasons:

"(a) Because, even with the fagots across the passageway, Patrick assumed the risk of passing over them.
"(b) Because defendant had furnished the boys with a safe place within which to work, and it was not responsible for the act of the boys in making the place dangerous by the piling of fagots."

The principle of assumed risk rests upon the ground that it is an implied contract between the employer and

the employé that the employé shall assume the risk of all dangers obviously incident to his employment. The doctrine of assumed risk applies, and is limited in its application to dangers which the employé either actually knows or should know. *Bradburn* v. *Railroad Co.*, 134 Mich. 575. And in such cases as this the age and experience of the employé and the necessity for instructions are to be considered in determining whether or not the employé assumed the risk. *Allen* v. *Jakel*, 115 Mich. 484; *King* v. *Lumber Co.*, 93 Mich. 172. When the servant shows that the injury received was in consequence of a risk not ordinarily incident to the employment, growing out of the master's negligence, the burden is then upon the master to show that the servant knew and understood the increased danger. *Swoboda* v. *Ward*, 40 Mich. 423; *King* v. *Lumber Co.*, supra.

Applying these rules to the present case, we think the court would not have been justified in directing a verdict for defendant on the ground of assumed risk. Up to noon of the day he met his death, young McDonald had been employed upon the small shears, 200 feet away from the big shears, where the fagots were piled upon trucks, and no such situation ever did or could arise as confronted him when he started to follow his shearman from behind the big shears. The two or three hours that he worked behind the big shears was the only time that he ever worked there, and, so far as the evidence discloses, he had no knowledge whatever of these particular machines, or of the method of disposing of the fagots there. The fair inference from the testimony is that his attention had never been called to these big shears. Mr. Morgan says:

"I had talked with Patrick about the work around the shears. I had not called his particular attention to these big shears, but I had called his attention when he started in to work. I went to him, and explained to him to be careful, and not get his hands where he would get hurt. I did that with all the boys when I would see a new boy on. Most of our shearing was done on these small shears, and it was only an occasional order that was sheared at these big shears."

There was nothing to attract his attention to the danger when he commenced his work. The passageway behind the machines was clear. The cogwheels on the east machine, when he passed it going to his own machine, were above his head, and were in no sense a source of danger. There were no cogwheels upon the machine at which he worked, and the efforts necessary to the taking care of a fagot "every five minutes or so" might naturally concentrate his attention upon his work, and prevent his considering the danger that might arise from the cogwheels upon the east machine in case he had to climb over the fagots to pass them. There is no claim that he had ever been cautioned that such a danger might arise, nor was there anything in the circumstances attending his passing the cogwheels when he went in to notify him that the passageway might later on be blocked with fagots which he would have to climb over. The youth of the boy, his lack of experience at the big shears, the novelty of the situation in this cul-de-sac, the necessity of climbing over the fagots suddenly presenting itself as the only way out to follow the shearman, the fact that they had been instructed to place the fagots there by the foreman, Points, all of these elements were to be considered in the light of the surrounding circumstances in determining whether the boy knew or ought to have known the danger which confronted him. We think the trial court properly submitted this question to the jury.

Did the court err in submitting the question of defendant's negligence to the jury? Both Morgan and Williams admitted that the piling of the fagots across the passageway behind the big shears would make the place dangerous. Mr. Morgan said: "Yes, if the stuff was piled up there, there would be some danger. If he would fall over, he would naturally put his hand on the shaft." Mr. Williams testified: "If scrap was piled up two or three feet high, it would be a dangerous place." Unless the scrap was piled across the passageway, there was no danger there at all. Mr. Williams testified:

" *Q.* In other words, if he stayed on the floor, why, of course, this gear wheel would be practically above him ?

"*A.* Yes, sir.

" *Q.* And if he was raised up for a distance, why it would be alongside?

"*A.* Yes, sir.

" *Mr. Lightner:* And the gear wheel, if I recollect, there would be no danger of getting caught in the gear wheel underneath, because it was revolving outward underneath ?

"*A.* Yes, sir.

" *Q.* But the danger would be of getting caught up above and getting drawn in; is that right ?

"*A.* Yes, sir."

In view of the conceded danger and the narrow space behind the machines, we think it was the duty of the defendant to take reasonable precautions to keep the passageway clear, and to that end to give instructions to the young lads before setting them to work at these big shears. We also think there was evidence from which the jury might be warranted in finding that the defendant had not discharged its duty in this regard. Mr. Morgan testified that:

" The scrap boys would place their scrap right behind them against the partition that shows in this picture, and if the space should become reasonably filled the scrap boy would naturally place it back along the partition, against the partition; but it was necessary for him to leave a path for him to work in.

"*Q.* Have you ever been there when you have seen that place so filled up that you couldn't pass through there ?

"*A.* Well, I must say that at times the scrap has been piled up there, and I have given instructions for them to take it away at once, not let it accumulate.

"*Q.* You never allowed it to stay there ?

"*A.* No.

"*Q.* And accumulate ?

"*A.* The instruction is to take it away, and not let it accumulate.

"*The Court:* You mean from the partition over toward where those cogwheels were ?

"*A.* Yes, sir."

And again:

" We had one man to take away those fagots when they were piled up from the shears around the mill. His name was O'Donnell. He was an old man, but he was awful strong. He had a hard job. * * * It was a hard job. The old man was kept busy. * * * The boys were accustomed to pile the scrap against the partition behind them. * * * If they put the scrap across, as the boy said they did, there wouldn't be room for them to get out without going over the scrap. As I said before, there was always more or less scrap piled there, and at some times an accumulation of it."

Mr. Williams testified, referring to the big shears:

" I had been around in this neighborhood more or less all day the day of the accident. I knew that McVeigh was working on these shears that afternoon immediately after dinner. * * * In the afternoon I recollect that Livingood was the shearman who was working on this one shown here, the one the young man got injured on; and I think French was his shear boy. * * * I have no particular recollection about its being filled up entirely that morning. * * * To the best of my knowledge, Patrick was quite a good boy, a bright boy, and I didn't remember him any better than the rest of them. I never heard of his being careless in any way around the machinery. I never heard a single complaint against him. * * * I have no recollection of having any talk with Patrick in regard—in relation—to warning him of the danger. * * * John Points usually gave instructions to the boys."

It is apparent from these quotations that the general manager and the superintendent were familiar with the method of doing the work, and that the general manager had witnessed an accumulation of the fagots, as shown by his answer to the court, " from the partition over toward where those cogwheels were." It is true he claims to have given instructions to take it away at once, and not let it accumulate, but it is apparent that these instructions were given the boys who were working at the big shears, at which young McDonald never worked until the day he was killed; and there is no claim that he was notified, either upon that day or at any other day, of the danger of

allowing such accumulations. Furthermore, the surviving scrap boy, French, testified that no such instructions were given to him, and, as to the instructions actually given, testified as follows:

"We were told to pile them in back against this partition. The straw boss told us that. I can't remember his name. The foreman, he told us to pile them against the partition, and those were the only instructions we had regarding the piling of those things. Those fagots that extended up near the cogs were placed there by Patrick and myself together. Patrick placed some of them there and I placed the majority. * * * This straw boss was our boss, and directed us where to place the fagots, and he directed us to place them between the two machines, and I put them where he directed, and there was no other place to put them. * * * The straw boss told us where to place these fagots. I guess he was a foreman. It was not O'Donnell. It was the straw boss. * * *

"Q. And this straw boss, was his name Points, do you know?

"A. I believe it was Johnnie Points. That was the man I referred to as the straw boss. And he told me to pile the fagots against the partition the first day I went to work in the mill. I worked on the shears that Pat was working on—on the shears to the left. Points came around and gave me instructions how to bundle up the scrap and where to throw it. I was alone, and he showed me the partition back against which I was to lay them, and I was never told anything different during the time that I was there."

Under the testimony of French, we think it was open to the jury to find that the boys were directed to pile the scrap where they did pile it, but defendant's counsel now contend that the instructions given by Mr. Points were not binding upon the company, since in giving them he was a fellow-servant of the scrap boys. It is doubtful whether we ought to consider this contention at this time, since the point was not made before the trial court, but was urged for the first time on the hearing in this court. However, we think that, under the circumstances of this case and the testimony of the superintendent, the defendant's duty to in-

struct, where necessary, had been committed to the foreman, John Points, so far as the shearing department was concerned; that, in the giving of instructions required for the safety and protection of the scrap boys before setting them to work upon a machine, he was doing the master's work, and the master was bound by his instructions. It is therefore our opinion that the circuit judge did not err in submitting the negligence of the defendant to the jury.

Defendant further contends that the judgment should be reversed because excessive. This contention is based upon the twenty-first and twenty-second assignments of error, which are as follows:

"21. The court erred in the entry of judgment upon the verdict of the jury for the sum of seven thousand four hundred eighty-seven dollars.

"22. That the amount of the verdict and of the judgment entered thereon is excessive, and is contrary to the evidence in the case."

The judgment was entered on the verdict for the sum of $7,487 February 1, 1904. Soon thereafter an order was entered staying proceedings for 20 days "to enable defendant to move for a new trial," etc. On the expiration of the 20 days a further order was entered extending the time to April 20th.

"On April 19th, while court was in session, the attorney for the defendant and Mr. Walker, one of the attorneys for plaintiff, appeared, and stated that they had agreed on this bill of exceptions. Defendant's attorney stated before the bill of exceptions was signed he desired that the court extend the time to move for a new trial and then sign the bill of exceptions. Plaintiff's attorney stated that he had no notice, and opposed such application. The court then refused to extend the time, or at this time to grant a new trial on its own motion because of excessive judgment."

These statements are contained in a separate certificate of the trial judge, not made a part of the bill of exceptions, and plaintiff's counsel contend that there is nothing before this court for review upon this point; citing *Hunn* v.

*Railroad Co.*, 78 Mich. 529 (7 L. R. A. 500). In our opinion, this contention of plaintiff's counsel is not well founded. The verdict and judgment should, we think, be set aside, because there is no foundation in fact or law upon which they can rest. The verdict, $7,487, is not only grossly excessive, but there is no evidence upon which to base it. The deceased boy had entered upon his fifteenth year, and was earning 75 cents per day. Another son, 17 years of age, and their father, plaintiff here, both working for the same defendant, earned, the former 85 cents to $1.25 per day; the latter, $1.75 a day. Plaintiff and his wife both testified that it cost the entire 75 cents a day to clothe, feed, and take care of the boy. The cost of such support would increase with his age. If, however, it be admitted that the cost of support would be but 75 cents per day for seven years, it follows that the jury found that this boy would earn $4.31 per day for 300 days in the year for seven years. There is no legal basis for such a verdict. Such earnings are wholly improbable, and not based upon experience. There is a possibility that any boy may be able to earn large sums of money. Verdicts, however, must be based upon facts proven and reasonable deductions therefrom, and not upon possibilities. A verdict which has no evidence upon which to base it is, in law, erroneous, and error can be assigned upon it without making a motion for a new trial. This case does not fall within the rule enunciated in *Hunn* v. *Railroad Co.*, 78 Mich. 513, 529 (7 L. R. A. 500), and *Coots* v. *City of Detroit*, 75 Mich. 628 (5 L. R. A. 315). In the former case the deceased was 27 years of age, and earned $900 a year. The mortuary tables, showing his expectancy of life to be 37.43 years, were introduced in evidence, also his physical condition, and other testimony reasonably affecting his duration of life. Complaint was made that the verdict of $7,575 was excessive. In the latter case plaintiff was seriously injured, and was entitled to recover for pain and suffering, and as well for the loss of time and incapacity to work. In such cases

the amount of compensation rests entirely in the sound judgment of the jury, and can only be considered where a motion is made for a new trial and denied. In such cases the court very properly said, "Whether damages found by a jury are excessive or not does not present a question of law." That rule does not apply to this case, where a parent is seeking recovery for the value of the service of his son, and, as the court instructed the jury, can recover only the amount of his prospective earnings until he would become of age, less what it would cost to support him. There is no pain or suffering, mental or physical, for which damages can be recovered. The time of service is fixed. The amount he was earning at the time of death is fixed. The data for the consideration of the jury were clearly established. In them is found no evidence to justify the conclusion that the boy would for seven years earn for his father, aside from the expense of support, an average of about $3.60 per day. Neither is there any justification in the common experience of mankind for such a result. That the minds of the jury were in some way prejudiced is apparent.

Plaintiff was permitted to testify that defendant's manager, in a conversation some time after the accident, told him that the factory inspector had ordered the gearing to be covered. One witness, employed by the American Tin Plate Company, was asked by counsel for plaintiff "if that was known as the 'Tin Plate Trust,' and if there were not many companies and corporations that made up that trust?" When asked by the court if that had anything to do with the case, counsel replied, "It may, and it may not." If the verdict could be justified by any evidence in the case, we might properly hold that these errors were harmless, and were cured by the ruling and instruction of the court. But where a verdict is grossly wrong courts will infer that it is due, to a great extent, to such errors. This evidence, coupled with the arguments of counsel, as appears from a statement in the

instruction of the court, may account for this verdict. While no exception appears to have been taken to the argument of counsel, yet, in view of a new trial, it is not improper to refer to it. The court, in his instruction, said:

"Gentlemen, you will remember that the attorneys on the part of the plaintiff here have called your attention to the suffering and the agony and the pain and all that sort of thing that was occasioned to the father and mother by reason of the death of this boy, and as to how much his death was worth, and as to what you gentlemen would take, if you had a boy, to have him killed under similar circumstances."

Such statements are highly prejudicial, and, of course, incompetent. Their utterances should be promptly suppressed by the court, whether opposing counsel object to them or not. The purpose of lawsuits is to attain justice. The natural effect of such statements is to defeat justice. The duty of courts is to so conduct trials that the ends of justice shall be reached.

Counsel for plaintiff asked that this court, if inclined to consider the question of excessive damages, adjust the matter without a reversal of the case. In other words, they ask that the amount of judgment be reduced. Twenty-five hundred dollars would give the plaintiff an average of a little over $350 per year. We think there is no evidence to justify any judgment beyond this. If the plaintiff elects to reduce the judgment to $2,500, the judgment may stand for that amount; otherwise a new trial will be granted.

Moore, C. J., and McAlvay, Grant, and Hooker, JJ., concurred.