### OTTO BREMER v. MINNEAPOLIS, ST. PAUL & SAULT STE. MARIE RAILWAY COMPANY.[1]

December 15, 1905.

Nos. 14,666—(232).

**Death by Wrongful Act.**

> In a personal injury action, the record examined, and, for reasons stated in the opinion, the damages awarded by the jury *held* excessive, and a new trial granted, unless the plaintiff will consent to a reduction of the amount of the verdict.

Action in the district court for Ramsey county by plaintiff as administrator of the estate of John Newbowers, deceased, to recover $5,-000 for the death of decedent. The case was tried before Kelly, J., and a jury, which rendered a verdict in favor of plaintiff for $3,000. From an order denying a motion for a new trial, defendant appealed. Affirmed, on condition that plaintiff consent to reduce the verdict to $2,000.

*A. H. Bright* and *Munn & Thygeson,* for appellant.
*C. D. & R. D. O'Brien* and *C. D. O'Brien,* for respondent

ELLIOTT, J.

This is an appeal from an order denying the defendant's motion for a new trial after a verdict in favor of the plaintiff. The action was brought by the administrator to recover pecuniary damages alleged to have been caused to William Newbowers by the death of his son, John Newbowers. It was admitted that John Newbowers was at the time of his death an engineer in the employ of defendant conpany and that he was killed by reason of the negligence of the defendant. The only

[1] Reported in 105 N. W. 494.

question was the amount of pecuniary loss which William Newbowers had suffered by reason of the death of his son. The court so instructed the jury, and they returned a verdict against the defendant for the sum of $3,000. The defendant asked the trial court to grant a new trial on the ground that the verdict was not justified by the evidence and was so excessive as to show that it was given under the influence of passion and prejudice, caused particularly by the improper language used by the attorney for the plaintiff in his address to the jury.

In view of the line of argument indulged in by the counsel for the plaintiff, it may be well to call attention to the well-established rule for determining the damages in a case of this character. It is settled law that the plaintiff can recover only such damages as will compensate him for the pecuniary loss suffered because of the death. It is not an action into which sentiment can be permitted to enter. It is a statutory action, in which, as said in Hutchins v. St. Paul, M. & M. Ry. Co., 44 Minn. 5, 46 N. W. 79, "no compensation can be given for wounded feelings, or for the loss of the comfort or companionship of a relative nor for the pain and suffering of the deceased. The basis on which the damages are to be estimated is the probable pecuniary loss of the widow or next of kin by reason of the death of the deceased, in view of all the facts and circumstances in evidence; and, if the verdict is greatly in excess of the sum thus arrived at, the court should set it aside or reduce it." At the time of his death John Newbowers was a single man about forty-six years of age, and his father, William, who was the only beneficiary under the statute, was seventy-four years of age. The son seems to have been financially comfortable, and was apparently the only one of six children who was able and disposed to aid and assist his father with money when the conditions seemed to call for it. William at one time worked on the railroad, and then for a time owned a team and did some hauling about the city of St. Paul. For some time he took care of the tools and served as a watchman on the street for the telephone company. For four or five years prior to the death of his son the father had been troubled with rheumatism and had not been able to do much work.

The circumstances under which and the extent to which he had received financial assistance from his deceased son appears from the following testimony: .

Q. Now, let me ask you whether or not your son John helped support you. [Mr. Thygeson: Now, that is a conclusion.] A. Well, that is just what I could depend on; the rest of them never gave me a penny. * * * Q. For how many years? A. Well— * * * Q. What did John do for you? Tell the judge and jury just what he did. A. Well, when I seen him, he asked me, he say, "Father, are you hard up?" I say, "Well, I can do sawing wood for my living, if I can," and he told me I better not. He say, if I want any support, he had money enough; he could help me; that is what he said. Q. Did he help you? A. He did. Q. For how many years has he been helping you with money? A. Oh, well, as I was able to work then I would not ask him; and he gave me, once in a while, $10 or $15. Q. You say, when you were able to work you would not ask him for any help? A. No; he gave me that out of his own will. Q. For how many years has he been giving you money? Whenever you needed it, is that so? A. Well, I guess about six or seven years ago. Q. Six or seven years? A. Yes; I couldn't exactly tell you what day or what year. Q. No; I know. Now, did any of your other sons or your daughter ever help you? A. Not a penny. Q. Not a penny? A. No, sir. Q. For six or seven years John has been giving you money, you say? A. Yes, sir, Q. Well, now, would he come to you and offer you the money, or would you go and ask him for it? A. No; you know he came here in the Union Depot— Q. Yes? A. And sometime in the winter time I went down there, you know— Q. Yes? A. On the Union Depot. Q. Yes? A. Here, and then when he see me, he say, "Father, come on; there ain't very much to do in the winter time. I give you some money." I thanked him for it, and that was all. And he came to visit me, too, here. Q. He used to come and visit you, too? A. I can prove it by a witness that he gave me money. Q. Just tell us what you saw yourself. We will take your word. Everybody knows you are not telling lies. But when he came to your house to visit you, used he give you money, too? A. Sure. Q. And you say for several years before his death he used to do

that?  A. Yes, sir; regularly.  Q. Regularly?  A. Yes.  Q. And none of your other children contributed at all to your support?  A. Not a cent.  Q. Did you ever ask them to help you?  A. No.  Q. Did you ever ask any of the others to help you?  A. No; never.

On cross-examination he testified as follows:

Q. You say that he gave you, once in a while, $10 or $15? A. Yes, sir; and he gave me last spring $25; sent me up to the . — Q. That would be from time to time and during the winter time when you were not working?  A. Yes; in the winter time and last summer.  Last spring he gave me over $25, and I should go in the Hot Springs.  And he gave me money to go to North Dakota.  Q. Now, there wasn't any regularity about it?  A. Oh, no.  Q. That is, as you worked here for the city during the summer time you were making money, and of course you didn't take any money from him at that time.  It was simply during the winter, when you met him down at the depot, and he would give you $5 or $10 or $15?  A. Sometime he ask myself; if I didn't ask it, he told me himself.  You know he always had money, quite a little money with him.  He call me.  He say, "Father, you needn't work so hard.  I give you $5 or $10, if you need it."  And I never refused it, neither.  Q. But you say, while you were working for the city, during the summer, of course, you didn't go and ask him for any money, and you didn't receive any at that time?  A. I never asked him anyhow.  Q. Now, can you tell, for instance, during the last year, how much would all the money ever given you, how much would it amount to, about?  A. Well, I can't swear to that; no.  Q. Would it amount to $50?  A. Well—  Q. Would it amount to as much as $50 a year?  A. Well—  Q. $25 a year?  A. I can't say exactly; I ain't got no idea about it.

According to the tables of expectancy William Newbowers' expectancy of life was 6.68 years, and the learned trial court estimated that the amount of the verdict would furnish him with something less than

$400 a year for the eight or ten years of life which the jury might reasonably assign him. The estimate is certainly very liberal, and somewhat more than the cases seem to justify; but we would not interfere with the conclusion of the trial court in this respect, if we were not forced to the conclusion that the verdict was the result of passion and prejudice on the part of the jury. The learned counsel for the respondent frankly confesses in his brief that he does not feel proud of the version of his speech which appears in the record, but suggests that the address of the opposite counsel furnished the provocation which, to a certain extent, at least, excuses his own oratorical indiscretion. But the inevitable result of an address of this character, delivered by a powerful, eloquent, and impressive speaker, is to carry the jury far beyond the evidence and induce an excessive and unreasonable verdict.

Counsel should be conceded wide latitude in addressing a jury; but passages such as the following cannot be justified by any claim of reasonable right or privilege, and are clearly improper and necessarily prejudicial to the right of the adverse party:

> Now, as I say, let's get at why the law of this state limits the amount to the nominal sum of $5,000. I don't know, and it is none of my affair, any more than it is of any other citizen of this state; but the logic and effect of it is to place everybody on a level. * * * If we are going to take up the social standing of a man, in contradistinction of Mr. Hill or a gentleman as prominent as he, and such a money-maker as he and Mr. Rockefeller, why, the laborer doesn't amount to anything, and you are referred back to the words of our Savior, " The poor you have always with you." And in a court of justice, when you are seeking to recover any damages which the law allows, you could not be heard, because who am I, or the ordinary laborer on the street, who is this man who makes his living, seventy-five years of age, sweeping the street, compared to some multimillionaire, because you can only give $5,000 to the multimillionaire, because the company ought to have a counterclaim against the laborer for his presumption and impertinence in choosing to assume that he is anybody?

After further remarks, to a part of which exceptions were taken. the counsel proceeded:

Now, these things may all be subject to exceptions. I don't know what the five judges of the Supreme Court are going to think about it; but, gentlemen of the jury, if any lawyer presenting his case in an American court is restricted to such a presentation of the case that everything which is natural and reasonable and occurs to the mind of the common man as being a matter to be considered in the case has to be cut out, then I want to resign my position at the bar. We are getting a little too artificial. A brood of men are being bred up who are employed nowadays in cases of this kind to undertake to make a claim in court that there is nothing left but materialism, that there is nothing left but the dollar, that there is no duty left except the dollar, that there is nothing left but the dollar, but that mind and soul and body and morals and life can be put upon the market and sold, and all you have got to say is, "What is the price and what is the market value of it in relation to it?" I don't believe that. I didn't surrender my right to think as a citizen when I paid for my certificate of admission to the bar; and I am not afraid of upper courts, even if they should disagree in relation to it, and I would rather be convicted in any court of misconduct in talking truth and honesty and those things which make life worth living to a jury of my fellow citizens than obtain a judgment which would put money in my pocket at the expense of those feelings and those ideas and those reasonings which God gives us for our preservation and for the protection, not only of our bodies, but also of our souls in relation to it. * * * Counsel says the legislature had the right to fix this. Yes; but the jury have the right to fix it within the amount permitted by the legislature. Isn't it time that a jury should begin to say something about these things; that it should be interested in the relation to it one way or the other? If you give too much, in the opinion of the Supreme Court, or in the opinion of this court, it will be set aside. The treasury of the Soo Road is well guarded. They are not dependent altogether upon the men that sit in front as a watchdog; but the law will guard it. You can't do wrong in

going to the limit, because, if you do, it can be corrected; but if you go below the limit, if you take the estimate of human life of people in their society and their relations to each other which the learned counsel undertook to do, and you go below it, there is no remedy for this man. He can't go up to the Supreme Court with that verdict. You can render a verdict in this case to any amount you see fit.

Mr. Thygeson: I think probably at this point I ought to ask the court to instruct counsel that the argument that they should go to the limit, and, if there is any wrong done, the Supreme Court may fix it, is improper argument.

Mr. O'Brien: What is the Supreme Court for, except to correct wrongs and errors? I said, if you went to the limit, and that limit was wrong, the Supreme Court could correct it. My God! Isn't that the law? Is there a newsboy that sells the Daily News upon the street, or the noon edition, with accounts of the baseball contests, that don't know it? What does my learned friend think this jury consists of? Are they gophers, or are they men with sense and intelligence? I say that it can be corrected and it is true. And I will also say, what is true, that if you make a mistake the other way, and go below what ought to be given in this case, Newbowers can't. * * * There is the difference.

There are other passages in the address which are almost equally objectionable.

An address of this character is clearly an abuse of the rights of counsel. It suggests to the jurors a measure of damages which is unknown to the law and must necessarily have improperly influenced their action. As this court said, in Wells v. Moses, 87 Minn. 432, 92 N. W. 334: "We are not disposed to embarrass counsel in the discharge of their duties by any unreasonable limitations upon their freedom of action and speech. 'An advocate may make himself the alter ego of his client and indulge in prejudice in his favor. He may even share his client's prejudices against his adversary so far as they rest on the facts in his case. But he had neither duty nor right to appeal to prejudices, just or unjust, against his adversary dehors the very case he has to try.

The very fullest freedom of speech within the duty of his profession should be accorded to counsel; but it is license, not freedom of speech, to travel out of the record, basing his argument on facts not appearing, and appealing to prejudices irrelevant to the case and outside of the proof.'" As said in McDonald v. Champion (Mich.) 103 N. W. 829: "Such statements are highly prejudicial, and, of course, incompetent. Their utterances should be promptly suppressed by the court, whether opposing counsel object to them or not. The purpose of lawsuits is to attain justice. The natural effect of such statements is to defeat justice. The duty of courts is to so conduct trials that the ends of justice shall be reached." And that means the protection of the rights of the parties as their rights are measured and recognized by the law.

The trial court should have granted a new trial or reduced the amount of the verdict. Wells v. Moses, supra. Belcher v. Ballou, 124 Iowa, 507, 100 N. W. 474. As the plaintiff was entitled to a verdict for a proper amount, to be determined by the rules of law as properly given the jury by the court, the verdict should be reduced to the sum of $2,000.

The question raised by the third assignment of error may be disposed of with the statement that we think it was not error to permit the plaintiff to show the dependent condition of William Newbowers to the extent disclosed by the record.

It is therefore ordered that a new trial be granted to the appellant, unless the respondent stipulates in writing that the verdict be reduced to the sum of $2,000 and gives notice thereof to the appellant's attorneys within ten days after written notice of the filing of this decision. If notice of such stipulation is given within the time specified, the order appealed from is to stand affirmed.