LINCE *v.* MONSON.

1. PHYSICIANS AND SURGEONS—MALPRACTICE—EVIDENCE.

Generally, it is necessary to the establishment of a cause of action for professional malpractice that there be expert testimony that what the attending physician or surgeon did was contrary to the practice in that and similar communities or omitted to do something which was ordinarily done in that or similar communities, an exception being when the lack of professional care is so manifest as to be within the common knowledge and experience of the ordinary layman that the conduct was careless.

2. SAME—OOPHORECTOMY—SUTURE OF URETER—EXPERT TESTIMONY —EMERGENCY.

Common knowledge and experience of ordinary laymen do not equip them to determine, without the aid of expert medical opinion, whether or not the suturing of a ureter of woman upon whom a right oophorectomy was performed to remove cystic ovary and to free various abdominal adhesions was the result of negligence, hence, where there was no expert testimony to support plaintiffs' cases, judgments *non obstante veredicto* were properly entered, the evidence presented showing that action taken by operating surgeons was necessary to save the patient's life because of areas of endometriosis that were encountered and which hemorrhaged so profusely as to obliterate landmarks and necessitated deep suturing quickly.

3. SAME—STANDARD OF CARE.

While careless professional practice may not be made immune from redress at law, no legal barriers may be erected to prevent a doctor from proceeding, in emergency or otherwise as his judgment directs and skills permit, for saving the life or health of the patient, without fear that his professional judgment

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 41 Am Jur, Physicians and Surgeons § 129.
[3] 41 Am Jur, Physicians and Surgeons § 98.

and action shall be subjected to the test of unlearned lay judgment without guidance of professional opinion as to compliance with professional standards and practice in the community.

Appeal from Wayne; Quinn (Timothy C.), J., presiding. Submitted January 4, 1961. (Docket Nos. 31, 32, Calendar Nos. 48,378, 48,379.) Decided April 26, 1961.

Case by Harvey Lince against Robert C. Monson and James W. Sinclair, individually and as copartners doing business as Monson & Sinclair, for malpractice in the performance of surgery. Similar action by Mary Anne Lince. Cases consolidated for trial and appeal. Judgments for defendants notwithstanding verdicts. Plaintiffs appeal. Affirmed.

*Paul G. Bogos* (*Robert W. Kefgen,* of counsel), for plaintiffs.

*Moll, Desenberg, Purdy & Glover* (*Richard A. Kitch,* of counsel), for defendants.

DETHMERS, C. J. Plaintiffs, husband and wife, sue defendant doctors for alleged malpractice in their professional treatment of plaintiff wife, hereinafter called the plaintiff. Appeal is from judgments *non obstante veredicto* for defendants.

On February 14, 1957, defendants performed a right oophorectomy, being the removal of the plaintiff's right ovary, which had become cystic, and lysis or freeing of certain abdominal adhesions. On May 1, 1957, defendants again performed surgery on the plaintiff for lysis of bowel adhesions and relief of bowel obstruction. They freed adhesions between bowels and the uterus and other adhesions which were binding down the small bowel in both the right and left quadrants in the cul-de-sac.

Defendant Monson, who performed the surgery, assisted by defendant Sinclair, testified that all this was done with great difficulty and took quite a bit of time because there were so many adhesions; that they also found small areas of endometriosis on the left side of the abdomen attached to the sigmoid, the abdominal wall, the bowels and the uterus, all of which he freed, and in the cul-de-sac a tremendous amount of endometriosis, probably the size of a hand, half an inch or more thick, which he freed. He described endometriosis as a condition in which endometrial tissue or lining of the uterus escapes the womb into an area where it is not normally present, testifying that wherever it touches it attaches and spreads like cancer, its cells growing wildly, that it looks somewhat like a sponge, is very vascular and friable, fragile and difficult to handle and bleeds profusely, and that a stitch cuts right through it like it would through butter. He further testified that it is customary, in seeing anything abnormal like this during surgery, to take a sample for laboratory analysis and check for possible malignancy; that as they took a small piece of the endometriosis profuse bleeding ensued; that they had to pack the bleeding and put stitches in it to try to stop the bleeding; that they had to put the stitches in deep into the endometriosis in an effort to make them hold and stop the bleeding; that the large quantity of endometriosis and blood obliterated the landmarks, so that it was impossible to see anything around while stitching; that the blood was just welling up and it was necessary to act with speed to prevent further hemorrhaging; that at one time they feared they were not going to be able to control the hemorrhage; that they were able to pack it just enough so they could put in a stitch and keep on going that way and so complete the operation. An expert medical witness testified

that, under such circumstances, this has to be done to save the patient's life.

During the next few weeks plaintiff received treatments for small bowel obstruction. On June 13, 1957, a different doctor operated on plaintiff. He testified that he then found that plaintiff's right ureter had become involved with a chromic catgut suture and was blocked; that this had caused a leakage of urine from that ureter which had formed a large cystic mass containing urine. He removed the cyst and repaired the ureter. He further testified that the injury to the ureter could have occurred during either the February or May, 1957, operations by defendants. The jury found that it did happen in the May operation.

All medical testimony was that the ureter is not the subject matter of the kind of operations performed by defendants in February or May, and that in such operations it is not standard practice to suture the ureter. Defendant Monson testified that he had not, to his knowledge, placed a suture around the ureter, but that it frequently happens when surgery is performed in that area and when the landmarks are so obliterated by excessive bleeding that the surgeon does not realize that the ureter is around there. Defendant Sinclair testified that the suturing done by defendants was not done near where the ureter normally is located; that when the hemorrhaging began and blood obscured the whole operative field, they applied packs, but, because of the friability of the endometriosis, they felt it was inadvisable to clamp it or put a tie on it because the tie would cut right through it, so, instead, they put a suture around the area which was bleeding and put a tie in that position, immediately stopping the bleeding. Expert medical testimony was that the existence of the mass of endometriosis, especially in an area where previous surgery had occurred, could dis-

place organs or structures such as the ureter from normal position; also, that, where structures are obliterated by bleeding, as here, it would be foolhardy to make further dissections of the mass and create further bleeding in order to identify structures not in view. The record, read in context, does not support the statement in plaintiff's brief that expert medical testimony was to the effect that the right ureter was not in the vicinity of the endometriosis which defendants were suturing. On the contrary, expert medical testimony was that the ureter must have been in the immediate neighborhood of the endometriosis mass. An expert medical witness testified, in response to the hypothetical question based on the assumption of the existence of the facts as described by the testimony on both sides of the case, that defendants "used the usual and ordinary practice in the handling of this case" and that the evidence of injury by suture to the ureter was not evidence of improper practice nor was there anything unusual in such occurrence; further, that insertion of a catheter into the ureter, under the circumstances of this case and because of the endometriosis mass, would not have enabled defendants to ascertain that a suture had entered the right ureter.

There was no medical testimony that defendants' treatment and handling of the case was not in accord with standard and usual practice of skilled doctors in the community.

In the ordinary negligence case a question is presented whether an ordinary, careful and prudent person would have done as defendant did under the circumstances. Presumably a jury of 12 persons, drawn from and representing a cross section of the community, is competent to judge that question, on the basis of its own knowledge and experience, and to determine negligence or freedom therefrom accordingly. Sometimes, in such cases, a problem pre-

sented is whether the question of defendant's negligence is one of fact for the jury or of law to be decided by the court. That is not the problem here. Rather, it must be determined in this case whether it is competent for a jury of laymen to decide a question concerning professional practice and to make a finding of malpractice without benefit of professional testimony to support it. In a case involving professional service the ordinary layman is not equipped by common knowledge and experience to judge of the skill and competence of that service and determine whether it squares with the standard of such professional practice in the community. For that, the aid of expert testimony from those learned in the profession involved is required. As this Court said in *Zoterell* v. *Repp,* 187 Mich 319, 330:

"As to those matters of special knowledge strictly involving professional skill and attention, unskillfulness, negligence, or failure to do that which ought to be done must be shown by the testimony of those learned in such matters."

"In conduct, like that of a surgeon, resting upon judgment, opinion, or theory, the ordinary rules for determining negligence do not prevail. *Luka* v. *Lowrie,* 171 Mich 122 (41 LRA NS 290); *The Tom Lysle* (WD Pa), 48 F 690; *Brown* v. *French,* 104 Pa 604; *Williams* v. *Le Bar,* 141 Pa 149 (21 A 525). One reason for the rule is that when one acts according to his best judgment in an emergency, he is not chargeable with negligence. *Luka* v. *Lowrie, supra; Staloch* v. *Holm,* 100 Minn 276 (111 NW 264, 9 LRA NS 712); *Williams* v. *Poppleton,* 3 Or 139; 30 Cyc, p 1587; *Sherwood* v. *Babcock,* 208 Mich 536.

"In order to submit a case of alleged malpractice to the jury, the plaintiff must produce medical testimony to the effect that what the attending physician or surgeon did was contrary to the practice in that or similar communities, or that he omitted to do something which was ordinarily done in that or simi-

lar communities." *Delahunt* v. *Finton,* 244 Mich 226, 229, 230.

In support of this general rule that expert testimony is essential to the establishment of a cause of action for professional malpractice, defendants cite *Spaulding* v. *Bliss,* 83 Mich 311; *Farrell* v. *Haze,* 157 Mich 374; *Neifert* v. *Hasley,* 149 Mich 232; *Miller* v. *Toles,* 183 Mich 252 (LRA 1915C, 595); *Sherwood* v. *Babcock,* 208 Mich 536; *Delahunt* v. *Finton,* 244 Mich 226; *Rytkonen* v. *Lojacono,* 269 Mich 270; *Rubenstein* v. *Purcell,* 276 Mich 433; *Dunbar* v. *Adams,* 283 Mich 48; *Perri* v. *Tassie,* 293 Mich 464; *Zanzon* v. *Whittaker,* 310 Mich 340; *Facer* v. *Lewis,* 326 Mich 702; *Taylor* v. *Milton,* 353 Mich 421.

Exceptions to that rule are to be found in cases where the lack of professional care is so manifest that it would be within the common knowledge and experience of the ordinary layman that the conduct was careless and not conformable to the standards of professional practice and care employed in the community. Among these are *LeFaive* v. *Asselin,* 262 Mich 443, *Winchester* v. *Chabut,* 321 Mich 114, and *Higdon* v. *Carlebach,* 348 Mich 363. In *LeFaive* the surgeon, after performing an appendectomy, sewed up the incision without removing a curved surgical needle from the abdominal cavity. In *Winchester* the proofs indicated that the surgeon, when closing up by sutures the incision made for reduction of a fractured femur, left a cotton gauze surgical sponge inside. In *Higdon* the defendant dentist was using a revolving separating disk to make space between 2 of plaintiff's teeth. The disk came in contact with her tongue. In these cases, it was the view of this Court that, as said by Mr. Justice WIEST in *Ballance* v. *Dunnington,* 241 Mich 383, 387 (57 ALR 262), concerning an excessively long exposure to X-ray, and quoted in *LeFaive* (p 446), "even the

merest tyro would know this was improper." Holdings that expert testimony was not prerequisite to recovery in those cases were predicated on the proposition that it would be within common knowledge and the experience of lay jurors whether the acts in question were careless and not in accord with standards of good practice in the community. Such is not the factual situation presented by this record.

Plaintiff's theory seems to be that because there is testimony that the ureter is not the subject matter of operations for the maladies defendants were seeking to correct and that they had not intended to suture or involve the ureter, therefore, it would be within the common knowledge of laymen, without the benefit of expert medical testimony, that the actual involving of the ureter by suture was negligence. The question here, however, is not that simple. Purpose of the operation and intent of the surgeon, alone, are not conclusive here. The question, rather, is whether the action of defendants, confronted with the endometriosis and hemorrhaging condition, obliterated landmarks and need for quick stopping of bleeding by placing stitches deep into the endometriosis mass, conformed to standards of good practice in the community. Common knowledge and the experience of ordinary laymen do not equip them to give the answer without the aid of expert medical testimony.

Careless professional practice must not be made immune from redress at law. This is imperative for the protection of the public. That same consideration, however, dictates that no legal barriers be erected against a doctor's proceeding, in emergency or otherwise, as his judgment directs and skills permit, for saving the life or health of the patient, without fear that his professional judgment and action shall be subjected to the test of unlearned lay judgment without the guidance of professional testimony

:as to compliance with professional standards and practice in the community.

Affirmed. Costs to defendants.

CARR, KELLY, SMITH, BLACK, EDWARDS, KAVANAGH, and SOURIS, JJ., concurred.