MITZ *v.* STERN

1. PHYSICIANS AND SURGEONS—MALPRACTICE—EVIDENCE—BURDEN OF PROOF—EXPERT TESTIMONY.

In order to submit a case of medical malpractice to the jury, the plaintiff must produce medical testimony to the effect that what the attending physician or surgeon did was contrary to the practice in that or similar communities, or that he omitted to do something which was ordinarily done in that or similar communities.

2. PHYSICIANS AND SURGEONS—MALPRACTICE—EVIDENCE—EXPERT TESTIMONY.

A defendant doctor's testimony may be used as the basis for establishing a malpractice action, and for this purpose no distinction is drawn between introducing his testimony under the adverse party statute or reading his deposition into the record (MCLA § 600.2161; GCR 1963, 302.4[2], 302.4[3]).

3. PHYSICIANS AND SURGEONS—MALPRACTICE—COMMUNITY STANDARD —DEFENDANT'S TESTIMONY—TRANSURETHRAL RESECTION.

Defendant doctor's own testimony that it is not a customary practice of the medical community to come in contact with the sphincter muscle when performing a transurethral resection was

---

REFERENCE FOR POINTS IN HEADNOTES

[1–3] 41 Am Jur, Physicians and Surgeons §§ 78–138.

sufficient evidence tending to show the standard of care to be exercised, and plaintiff could rely on it in attempting to establish a *prima facie* case of medical malpractice.

Appeal from Wayne, George E. Bowles, J. Submitted Division 1 October 15, 1970, at Detroit. (Docket No. 7,147.) Decided October 28, 1970.

Complaint by Harold Mitz against Julian Stern for medical malpractice. Verdict and judgment for plaintiff. Defendant appeals. Affirmed.

*Weinstein, Kroll & Gordon,* for plaintiff.

*Vandeveer, Doelle, Garzia, Tonkin & Kerr* (*Charles Rubinoff,* of counsel), for defendant.

Before: J. H. GILLIS, P. J., and DANHOF and MAHINSKE,* JJ.

J. H. GILLIS, P. J. This is a medical malpractice action brought by plaintiff, Harold Mitz, against defendant, Dr. Julian Stern. On November 21, 1968, a jury found in favor of plaintiff and awarded him $30,000 damages. Defendant's motions for judgment notwithstanding the verdict, or, in the alternative, for a new trial were denied. Defendant appeals the trial court's denial of these motions.

Plaintiff was referred to defendant when he developed difficulty urinating. Defendant, a specialist in urology, informed plaintiff that surgery was required to correct this problem. After the transurethral resection operation and release from the hospital, plaintiff suffered a continual incontinence, *i.e.,* an inability to prevent urine discharge. Plaintiff saw defendant several times and was repeatedly

---

* Circuit judge, sitting on the Court of Appeals by assignment.

told by defendant that his incontinent condition would cease with time. Plaintiff finally went to Dr. A. Waite Bohne, chief urologist at Henry Ford Hospital, who examined him and found that plaintiff's external sphincter muscle was damaged. The external sphincter muscle controls the voluntary flow of urine from the bladder. Dr. Bohne advised plaintiff to wear a ural sheath. This is a device which is attached to the opening of the penis and funnels involuntary urine drainage to a sack attached to the leg.

A transurethral resection of the prostate gland is performed by inserting a resectoscope into the channel through the penis. The surgical instrument has a small metalic loop at the end and, when electrically activated, the vesicle neck obstruction of the bladder is scraped out. It was agreed by both parties that the community standard for practicing urologists is that the external sphincter muscle is not cut during a transurethral prostatectomy.

Dr. Bohne's examination disclosed that a small area of the external sphincter muscle was damaged:

"*Q*. So, as you're going through there is a lens. Is there also a light on the instrument?

"*A*. That's right.

"*Q*. That illuminates it so that you can see as you—these parts of it and you examine it as you're going all the way up to the neck of the bladder, is that correct, Doctor?

"*A*. That's right.

"*Q*. All right. Now, will you tell us what the results of your examination were?

"*A*. At the time of examination I observed that Mr. Mitz had a resection of his prostate, that it was adequate, the vesicle neck was open—that is the part nearest the bladder—that the external sphincter, which is at the distal end of the prostatic

urethra had appeared at least to have been damaged in a small area, from one to two o'clock.

"*Q.* Now, Doctor, in the course of the—did you make an entry into the hospital record as to your findings as a result of this examination?

"*A.* Yes.

"*Q.* And would you read to the jury what those findings were?

"*A.* The typewritten note dated on the 9th of September, '63, reads thus: 'With the patient in the lithotomy position after appropriate draping and preparation, a no. 24 endoscope was passed into the bladder with ease. Examination of the posterior urethra revealed a good resection but as the external sphincter was approached it was seen that the previous resection had been carried too far distally in the region of one to two o'clock so that *part of the external sphincter was missing in this area.* [Emphasis supplied.]

" 'The bladder was filled. The endoscope was withdrawn and the patient was immediately incontinent.

" 'Upon reinsertion of the endoscope, the previous findings were reconfirmed. The bladder was emptied and the patient was returned to his room in good condition.' "

Plaintiff read defendant's deposition into the record. Therein defendant stated that he did not cut the sphincter muscle during the operation nor did the patient demonstrate the symptoms of such injury immediately following surgery. On cross-examination, the defendant, instead, offered various explanations for the damage which occurred during the prolonged cauterization of excessive bleeding:

"*Q.* You have said here that the excessive bleeding required a period of approximately two hours for cauterization, or some attempt to bring the bleeding under control?

"*A.* Yes, sir.

"*Q.* During that time, with the Bakelite tube through the sphincter muscle, that is, distending it, could anything occur to the sphincter, in your opinion?

"*A.* Several possibilities occurred to me that might happen, one is the stretching of the sphincter may result in impairment of the blood supply, which is known medically as ischemia; when allowed to occur over a period of two hours may result in scarring of this sphincter, with subsequent distortion of its normal circular contour.

"Another thing that comes to my mind that might occur in a prolonged procedure is actual tearing, if you will, due to the manipulation of the instrument.

"*Mr. Weinstein:* Might I ask what instrument is the doctor talking about?

"*A.* The resectoscope, the movement back and forth, and from side to side, and up and down, may cause additional stretching of this muscle, which supposedly might tear or stretch the muscle fibers, thereby resulting in abnormal scarring tissue to form.

"The third thing that occurs in prolonged cauterization, especially in the region adjacent to the sphincter, is that scarring may occur adjacent to the sphincter, and thereby contract and further distort the normal circular contour of the sphincter muscle."

The trial court, in denying defendant's motions, concluded:

"First, expert medical testimony, that from the defendant itself, established that no urologist under the standard of practice prevailing would cut the external sphincter muscle because of bleeding. The defendant himself testified that if there is bleeding it is the standard of practice of doctors in the field of urology to refrain from cutting until he can actually see where the landmarks are. Second, the

jury could find under the proofs as indicated above that the external sphincter muscle was cut. It was for them to accept this theory or defendant's theory that the scarring resulted from cauterization. Three, the jury could find that the cutting of the sphincter is a proximate cause of plaintiff's incontinence which has continued to the present. They could also find that damages were allowable in the amount awarded."

In a malpractice suit, as in any negligence action, plaintiff must sustain the burden of proof. The Michigan rule for such cases is set forth in *Lince* v. *Monson* (1961), 363 Mich 135, 140:

"In order to submit a case of alleged malpractice to the jury, the plaintiff must produce medical testimony to the effect that what the attending physician or surgeon did was contrary to the practice in that or similar communities, or that he omitted to do something which was ordinarily done in that or similar communities."

On appeal, the defendant raises three issues, only one of which we find to have merit. The question presented is whether in a malpractice action expert testimony may be elicited from the defendant physician. We held in *Giacobazzi* v. *Fetzer* (1967), 6 Mich App 308, that the defendant-doctor's testimony could be utilized as the basis for establishing a malpractice action. For purposes of this opinion, there is no distinction drawn between introducing the defendant's testimony under the adverse party statute, MCLA § 600.2161 (Stat Ann 1962 Rev § 27A-.2161) as in *Giacobazzi* v. *Fetzer, supra;* or in reading his deposition into the record, *Ruhala* v. *Roby* (1967), 379 Mich 102; GCR 1963, 302.4(2), 302.4(3). In either instance, the burden of proving the standard of care still remains upon the complainant, and such proof in most cases must come with the aid

of expert testimony. *Lince* v. *Monson, supra; Skeffington* v. *Bradley* (1962), 366 Mich 552. But unlike the situation in *Skeffington* v. *Bradley, supra,* there is the defendant's own expert testimony here which establishes that it is not a customary practice of the medical community to come in contact with the sphincter muscle when performing a transurethral resection. As we held in *McPhee* v. *Bay City Samaritan Hospital* (1968), 10 Mich App 567, 570, the defendant's

"[o]wn testimony was, for the purposes of this case, sufficient evidence tending to show the standard of care to be exercised and that the plaintiff could rely on this testimony in attempting to establish a *prima facie* case."

Viewing all testimony in a light most favorable to the plaintiff, *Humenik* v. *Sternberg* (1963), 371 Mich 667, we take note that the damage to the sphincter muscle was substantiated, that the defendant's conduct could have caused that injury, and that it was a proximate cause of the plaintiff's incontinence. *Morgan* v. *Engles* (1964), 372 Mich 514.

Judgment affirmed. Costs to plaintiff.

All concurred.