SPONENBURGH v WAYNE COUNTY

Docket No. 44677. Submitted August 19, 1980, at Detroit.—Decided
    June 3, 1981. Leave to appeal applied for.

    Joan Sponenburgh, as guardian of Brian Sponenburgh, brought
        an action against the County of Wayne, as operator of Wayne
        County General Hospital, for medical malpractice of the em-
        ployees, physicians, and staff of the hospital. Following trial, a
        jury returned a verdict for plaintiff. Defendant moved for a
        judgment notwithstanding the verdict, which motion was de-
        nied. Judgment on the verdict was entered, Wayne Circuit
        Court, William J. Giovan, J. Defendant appeals, alleging that
        the trial court erred in submitting the issue of professional
        negligence to the jury on insufficient evidence, that the verdict
        of the jury was against the great weight of the evidence, and
        that the trial court erred in allowing plaintiff's counsel to read
        during closing argument from a learned treatise not admitted

REFERENCES FOR POINTS IN HEADNOTES
[1] 4 Am Jur 2d, Appeal and Error § 110.
[2] 5 Am Jur 2d, Appeal and Error §§ 885, 886.
    46 Am Jur 2d, Judgments § 113.
[3] 61 Am Jur 2d (Rev), Physicians, Surgeons, and Other Healers
    § 205 et seq.
[4] 5 Am Jur 2d, Appeal and Error §§ 833–835.
[5, 6] 31 Am Jur 2d, Expert and Opinion Evidence §§ 66–68.
    Use of medical books or treatises as independent evidence. 17
    ALR3d 993.
[5, 6]Use of medical or other scientific treatises in cross-examination
    of expert witnesses. 60 ALR2d 77.
[7] 5 Am Jur 2d, Appeal and Error § 783.
[8] 73 Am Jur 2d, Stipulations §§ 8, 13.
[9, 10] 30 Am Jur 2d, Evidence §§ 914, 927, 928.
    Admissibility under business entry statutes of hospital records in
    criminal cases. 69 ALR3d 22.
[11] 29 Am Jur 2d, Evidence §§ 884, 885.
[12] 29 Am Jur 2d, Evidence § 801.5.
    Use of videotape to take deposition for presentation at civil trial in
    state court. 66 ALR3d 637.
    Admissibility of videotape film in evidence in criminal trial. 60
    ALR3d 333.

into evidence, in admitting certain hospital records to impeach the testimony of the hospital's agent regarding a hypothetical question, in admitting a newspaper clipping into evidence, and in denying defendant's request for a viewing by the trial judge of a video deposition prior to its introduction into evidence. *Held:*

1. Sufficient expert testimony was presented to establish the appropriate standard of care necessary and that such care was not given to Brian Sponenburgh. Thus the trial court properly denied defendant's motion for a judgment notwithstanding the verdict.

2. Expert testimony regarding the appropriate standard of care and other testimony indicating that the standard was not met leads to the conclusion that the verdict was not against the great weight of the evidence.

3. The trial court erred in allowing plaintiff's counsel during closing argument to read an excerpt from a learned treatise which had not been admitted into evidence, but such error was harmless because, since the excerpt was read in the context of impeachment of testimony of defendant's expert witness, the trial court did not intend or state that the excerpt was to be read for any other reason and the excerpt was clearly cumulative of other excerpts properly admitted.

4. The trial court properly admitted certain hospital records as business records to impeach defendant's agent and as admissions by conduct against interest and as prior inconsistent conduct. But the records should not have been used to impeach the testimony of defendant's agent regarding a hypothetical question since the cases were not identical. Any error, however, was harmless, and admission of the records was the result of a stipulation between the parties.

5. The trial court in its discretion properly admitted a newspaper article for the purpose of showing that it had appeared in the newspaper.

6. The trial court properly denied defendant's request for a viewing by the court of the video deposition of plaintiff's expert because the request was made after the time limitation prescribed by court rule, no written transcript of the deposition was provided for the court to review, a delay in previewing would inconvenience the jury, and there was no showing of manifest injustice.

Affirmed.

1. JUDGMENTS — MOTIONS — APPEAL — DIRECTED VERDICTS.
The Court of Appeals in reviewing a denial of a motion for a

directed verdict upon completion of the proofs of the nonmoving party will consider the proofs and reasonable inferences drawn therefrom in a light most favorable to the nonmovant, and where the facts are such that reasonable persons could honestly reach different conclusions the denial of such motion will be held to be proper.

2. JUDGMENTS — MOTIONS — APPEAL — JUDGMENT NOTWITHSTANDING THE VERDICT.

A judgment notwithstanding the verdict is properly rendered on motion of a party only where the evidence presented is insufficient as a matter of law to support a judgment for the nonmovant, and on appeal the Court of Appeals must give the nonmovant the benefit of every reasonable inference which could have been drawn from the evidence and, if reasonable minds could honestly disagree as to whether the nonmovant has satisfied his burden of proof on the necessary elements of his cause of action, the rendering of such a judgment is improper.

3. PHYSICIANS AND SURGEONS — NEGLIGENCE — MEDICAL MALPRACTICE — EVIDENCE — STANDARD OF CARE.

A plaintiff in an action for medical malpractice, in order to submit his case to the jury, must produce medical testimony to the effect that the actions of the attending physician were contrary to the practice in that or similar communities or that the physician failed to do something which was ordinarily done, and where the physician has so departed from such standard of care or customary medical practice he is responsible for damages arising from his actions.

4. APPEAL — JUDGMENT NOTWITHSTANDING THE VERDICT.

An appellate court in determining whether a jury's verdict is against the great weight of the evidence should confine itself to a comprehensive review of all of the evidence and determine from the record whether the verdict is so plainly a miscarriage of justice as to call for a new trial.

5. EVIDENCE — LEARNED TREATISES — IMPEACHMENT — ADMISSIBILITY — RULES OF EVIDENCE.

Statements contained in learned treatises are admissible for impeachment purposes only and not as substantive evidence (MRE 707).

6. EVIDENCE — LEARNED TREATISES — SUBSTANTIVE EVIDENCE — IMPEACHMENT — EXPERT WITNESSES — RULES OF EVIDENCE.

The allowance by a trial court in an action for medical malprac-

tice of the reading during closing argument of an excerpt from a learned treatise not previously admitted into evidence for purposes of impeachment relating to the standard of care to be applied in the case constitutes error, but the error is harmless where the excerpt is read in the context of the impeachment of an expert witness's testimony, the trial court does not intend or state that the excerpt was to be read for a reason other than impeachment, and the excerpt is clearly cumulative of other excerpts properly admitted (MRE 707).

7. APPEAL — PREJUDICIAL ERROR.

The determination on appeal whether prejudicial error has occurred depends on the circumstances of each case and requires a conclusion that the substantial rights of a party were affected thereby, and, where it is so found, reversal is necessary regardless of whether the trial court attempted to cure the error by an instruction to the jury (GCR 1963, 529).

8. COMPROMISE AND SETTLEMENT — STIPULATIONS — MISTAKE — APPEAL.

A litigant who on appeal asserts error in a stipulation made in open court carries a heavy burden of persuasion; every presumption of judicial care, professional competence, and of decretal stability is against the overthrow of such stipulation and of orders and decrees based thereon.

9. EVIDENCE — HEARSAY — BUSINESS RECORDS — STATEMENTS AGAINST INTEREST — RULES OF EVIDENCE.

Facts contained in hospital records other than those relating to a patient's history and diagnosis are admissible under the business records exception to the hearsay rule where they relate to acts, transactions, occurrences, or events which could be used to impeach testimony by an agent of a party or as admissions by conduct against interest or prior inconsistent conduct (MRE 801[2], 803[6]).

10. EVIDENCE — HOSPITAL RECORDS — HYPOTHETICAL QUESTIONS — IMPEACHMENT.

Admission of hospital records for the purpose of impeaching the testimony of a witness for the hospital regarding a hypothetical question constitutes error where the records do not involve a situation identical to that posed hypothetically, but such error is not prejudicial where the records are admissible for other purposes, the issue of lack of identity between the records and the hypothetical case is properly raised by objection, and the

admission of the records is the result of a stipulation between the parties.

11. Evidence — Hearsay.

Admission of a newspaper article by a trial court in its discretion for the limited purpose of showing that it appeared in the paper and not to prove its contents does not violate the hearsay rule (MRE 801[c]).

12. Evidence — Unedited Video Depositions — Review Prior to Admission — Manifest Injustice — Court Rules.

Admission of unedited video deposition testimony by a trial court does not constitute error where a request that a trial judge view the visual deposition is made by a party after the time limitation prescribed by court rule, no written transcript of the deposition is available for review by the court, delay in previewing the video tape would inconvenience the jury, and where there is no showing that the testimony is so manifestly prejudicial as to deny the party a fair trial (GCR 315.6[2]).

*Charfoos & Charfoos, P.C.* (by *David W. Christensen* and *Lawrence S. Charfoos)*, and *Hayim I. Gross* (of counsel), for plaintiff.

*Garan, Lucow, Miller, Seward, Cooper & Becker, P.C.,* and *John J. McCann,* for defendant.

Before: J. H. Gillis, P.J., and N. J. Kaufman and R. M. Maher, JJ.

N. J. Kaufman, J. This is an appeal from a judgment in a medical malpractice case. The plaintiff in the instant action, Joan Sponenburgh, guardian of Brian Sponenburgh, a mentally incompetent person, claims that her son, Brian, suffered total and permanent brain damage as a result of the negligence of Wayne County General Hospital and its employees, physicians, and staff in failing to immediately institute proper treatment for carbon monoxide poisoning. On September 22, 1977, a Wayne County Circuit Court jury found for the plaintiff in the amount of $3,088,000. A motion for

judgment notwithstanding the verdict or for a new trial was denied by order of that court on April 3, 1979. Defendant Wayne County, which operates Wayne County General Hospital, now appeals as of right, pursuant to GCR 1963, 806.1.

Because of the complexity of the case before us, a recitation of the pertinent facts is necessary. On August 2, 1968, Brian Sponenburgh, a 17-year-old male, was discovered by his aunt in an unconscious condition lying on the front seat of an automobile located in the garage of the Sponenburgh home. The garage doors were closed, and the automobile's engine was running. Brian had been seen last by his brother approximately one hour before being found by his aunt.

Soon after his discovery, Brian was taken by. a rescue squad out to the yard in the. open air. Firemen administered *100 percent oxygen* via face mask to Brian, who was comatose. Shortly thereafter, Brian was taken by ambulance to a nearby hospital, St. Mary's Hospital in Livonia, where he arrived at approximately 10:10 a.m. While in the ambulance, oxygen was again administered to Brian by a face mask. Upon arrival at St. Mary's, Brian was taken into the emergency room, where his condition was recognized as being a result of carbon monoxide poisoning. A constant supply of *100 percent oxygen* was administered to him through an endotracheal tube.

After being seen in the emergency room at St. Mary's, Brian was transferred by ambulance to Wayne County General Hospital. As testified to by the examining physician at St. Mary's, Dr. Napoleon Imperio, the reasons for the transfer were that St. Mary's did not have an intensive care unit or a hyperbaric oxygen chamber. Dr. Imperio knew Wayne County General had such a chamber,

and he anticipated that it would be used with Brian.

At approximately 11:15 a.m., 20 minutes after leaving St. Mary's, Brian Sponenburgh arrived at Wayne County General Hospital. He remained in the emergency room there for approximately two hours. During this period of time he was not placed in a hyperbaric chamber, nor was he given 100 percent oxygen by endotracheal tube or face mask. A concentration of approximately 30 to 40 percent oxygen was administered to him via nasal prongs.

At 1:15 p.m., Brian Sponenburgh, still unconscious, was taken to the pediatric ward. There is some dispute as to whether the room to which he was admitted was considered an intensive care area within the pediatric section at the hospital. It was stated by Dr. Vaughn, one of defendant's witnesses, that the ward to which Brian was taken could be considered an intensive care unit if it contained the proper equipment for monitoring the patient and if such monitoring was done in fact. Dr. Vaughn testified that such monitoring would occur about every five minutes in an intensive care unit. Dr. Kuhns, another of defendant's witnesses, testified that Brian never was placed in intensive care. Dr. Imperio also stated that frequent monitoring was part of intensive care. Whether or not the room in which Brian was placed could have been considered an intensive care unit under the proper circumstances, it is uncontroverted that during the first two hours of Brian's hospital stay his condition was, in fact, monitored on only one occasion and with even greater infrequency thereafter.

The patient remained in Wayne County General Hospital from August 2, 1968, to December 9,

1968. He at no time was placed in the hyperbaric chamber, nor was he given oxygen via endotracheal tube or face mask. His basic treatment continued to be oxygen via nasal prongs. Testimony was heard to the effect that Brian Sponenburgh received no treatment for carbon monoxide poisoning but was treated instead for aspiration pneumonia.

Brian Sponenburgh was discharged from Wayne County General Hospital with permanent brain damage. It is undisputed that he suffers and in the future, will, continue to suffer from brain damage, spastic paralysis of his body, loss of vision, inability to communicate, inability to walk without external support, and loss of coordination of his limbs, hands, and feet. Brian Sponenburgh is totally and permanently disabled.

Plaintiff claims that the brain damage proximately was caused by the negligence of Wayne County General Hospital and its employees, physicians, and staff in failing immediately to institute proper treatment for carbon monoxide poisoning and specifically in failing to utilize the hyperbaric chamber or administer *100 percent oxygen* in some other form, in failing to place the patient in an intensive care unit, and to test and monitor him in accordance with required medical standards.

Defendant claims that the brain damage had occurred in the garage or immediately thereafter and was irreversible. Defendant further claims that the standard of care in 1968 did not mandate use of a hyperbaric chamber nor of any of the other measures claimed by plaintiff.

Defendant's first contention of error is twofold. Defendant argues that there was insufficient evidence of negligence in breaching the 1968 stan-

dard of care regarding treatment of carbon monoxide poisoning and the use of hyperbaric chambers adduced at trial to have submitted the question of professional negligence to the jury. If, however, a submissible question of fact was presented, defendant alleges that the jury's verdict was against the great weight of the evidence. Defendant asserts that due to the insufficiency of evidence on the standard of care, plaintiff did not establish a prima facie case of professional negligence and that the trial court, therefore, should have granted a directed verdict.

Plaintiff argues that the 1968 standard of care requiring defendant to provide Brian Sponenburgh with 100 percent oxygen in the most efficient manner available and to place him in an intensive care unit, frequently monitoring his condition, indeed, has been established. Furthermore, plaintiff asserts that defendant's breach of this standard also has been established.

In reviewing denial of a directed verdict for defendant on completion of plaintiff's proofs, this Court considers proofs and reasonable inferences therefrom in a light most favorable to the plaintiff. *Signs v The Detroit Edison Co,* 93 Mich App 626; 287 NW2d 292 (1979). A motion for directed verdict is properly denied when, upon viewing the evidence in a light most favorable to the nonmovant, the facts are such that reasonable persons could honestly reach different conclusions. *Tiffany v The Christman Co,* 93 Mich App 267; 287 NW2d 199 (1979).

A judgment notwithstanding the verdict (n.o.v.) on defendant's motion is appropriate only if the evidence is insufficient as a matter of law to support a judgment for the plaintiff. In reviewing a motion for a judgment n.o.v., an appellate court

must give the nonmoving party the benefit of every reasonable inference which could have been drawn from the evidence. If reasonable minds honestly could disagree as to whether plaintiff has satisfied his burden of proof on the necessary elements of his cause of action, a judgment n.o.v. is improper. *Cormack v American Underwriters Corp*, 94 Mich App 379; 288 NW2d 634 (1979), *Sabraw v Michigan Millers Mutual Ins Co*, 87 Mich App 568, 571; 274 NW2d 838 (1978), *Fitzpatrick v Ritzenhein*, 367 Mich 326; 116 NW2d 894 (1962).

In *McPhee v Bay City Samaritan Hospital*, 10 Mich App 567, 570; 159 NW2d 880 (1968), the Court stated:

> "A treating physician is responsible in damages for unfortunate results when it is shown that he has departed from that standard of care which is known as customary medical practice. *Skeffington v Bradley*, 366 Mich 552 [115 NW2d 303] (1962), *Zoterell v Repp*, 187 Mich 319 [153 NW 692] (1915). The burden of proving that standard of care is upon the complainant, and such proof must come, in most cases, with the aid of expert testimony from those learned in the profession. *Lince v Monson*, 363 Mich 135 [108 NW2d 845] (1961), *Skeffington v Bradley, supra.*"

See *Mitz v Stern*, 27 Mich App 459; 183 NW2d 608 (1970).

In *Lince v Monson*, 363 Mich 135, 140-141; 108 NW2d 845 (1961), the Court stated the following regarding the standard of care to be established by a plaintiff in a malpractice suit or negligence action:

> " 'In order to submit a case of alleged malpractice to the jury, the plaintiff must produce medical testimony to the effect that what the attending physician or

surgeon did was contrary to the practice in that or similar communities, or that he omitted to do something which was ordinarily done in that or similar communities.' " (Citation omitted.)

Very recently, in *Patelczyk v Olson,* 95 Mich App 281, 290; 289 NW2d 910 (1980), this Court, in assessing the correctness of a directed verdict for the defendant-physician, adopted a very strict view as to when a standard of care has been established. The Court suggested that an expert testifying to the applicable standard of care should state that a certain procedure is standard for physicians exercising ordinary care and that failure to follow such procedure constitutes malpractice. However, in *Moore v Foster,* 96 Mich App 317, 321-322; 292 NW2d 535 (1980), another panel of this Court enunciated the traditional test for the establishment of negligence in a medical malpractice case:

"[T]he plaintiff must produce medical testimony to the effect that what the attending physician did was contrary to the practice in that or similar communities, or that he omitted doing something which was ordinarily done in that or similar communities. * * * In other words, a physician is responsible in damages for unfortunate results when it is shown that he has departed from that standard of care which is known as customary medical practice." (Citations omitted.)

In her complaint, plaintiff alleged that defendant had breached its standard of care in several ways, including failure to administer sufficient oxygen, failure to treat Brian in an intensive care unit, and failure to use the hyperbaric chamber. On appeal, defendant argues as though the plaintiff has alleged that the hospital's failure to use its hyperbaric chamber was the sole breach of the standard of care. This is not the case.

It is true that the trial transcript reveals no expert testimony that unequivocally states that use of a hyperbaric chamber was standard practice in 1968 or that failure to administer oxygen to a carbon monoxide victim via such chamber would constitute breach of the standard of care. See *Patelczyk, supra.* Thus, if plaintiff's claim were based solely on defendant's failure to use the chamber in treating Brian, this Court might agree that a prima facie case for submission to a jury had not been made and that a directed verdict for defendant could have been proper. However, because plaintiff clearly asserted that administration of 100 percent oxygen by some means and that placement of Brian in an intensive care unit as required to meet the standard of care for treatment of carbon monoxide poisoning, our inquiry does not end here.

Dr. Vaughn, one of the physicians who treated Brian at defendant hospital, stated that administration of 100 percent oxygen in the most efficient way was the preferred mode of treating carbon monoxide poisoning. This concentration of oxygen could have been administered by face mask, by endotracheal entubation, or by hyperbaric chamber. It nowhere is denied that defendant hospital used the only method which could *not* deliver *100 percent oxygen:* nasal prongs—a treatment which provided only a 30-40 percent concentration of oxygen. This was the sole means by which oxygen ever was delivered to Brian.

Dr. Imperio, the physician who treated Brian in the emergency room at St. Mary's Hospital, testified that endotracheal administration of oxygen was part of Brian's treatment at St. Mary's and that he anticipated that Brian would receive better treatment at Wayne County General. Dr. Impe-

rio also stated that Brian's condition, upon arrival, was critical, and that intensive care and frequent monitoring were indicated.

Although, as previously noted, there was considerable equivocation on this subject by some of defendant's staff, the evidence is clear that Brian never was provided with the monitoring typical of that given in an intensive care unit.

Although Dr. Vaughn testified that he was unsure whether Brian was ever placed in an intensive care unit, he also testified that intensive care was indicated for Brian and that Brian's vital signs should have been monitored and that 100 percent oxygen should have been administered.

Dr. Kuhns, a resident in charge of Brian's case, testified as follows:

"*Q.* Now, during the month of August, was Brian placed in intensive care?

"*A.* No.

"*Q.* Did you have the authority yourself to order intensive care if you thought it was indicated?

"*A.* At that time I didn't know what authority I had or did not have since I had just been at Wayne County for one day, I didn't know if I had it or not.

"*Q.* Did you ever attempt to have him placed in intensive care?

"*A.* No."

Dr. Kuhns also testified that Brian was treated only for aspiration pneumonia during his hospital stay after his treatment for carbon monoxide poisoning via nasal prongs was ended and after the doctors had received results from their carboxyhemoglobin tests.

It is our view that sufficient expert testimony was presented to establish the appropriate standard of care for a carbon monoxide victim as

consisting of intensive care with frequent monitoring and administration of 100 percent oxygen. Viewing the record as a whole in the light most favorable to the plaintiff, reasonable men could differ as to whether defendant had breached the applicable standard of care in not placing Brian in intensive care and in failing to administer 100 percent oxygen by any available means. Therefore, the trial court did not err in refusing to direct a verdict in defendant's favor and in submitting the issue to the jury.

Defendant further contends that the jury's verdict was against the great weight of the evidence. In *Patterson v Thatcher,* 273 Mich 597, 600; 263 NW 882 (1935), the Supreme Court stated the following in regard to the issue of the great weight of the evidence:

"We confine ourselves to a comprehensive review of all of the evidence, having in mind the burden of proof and according due allowance to the advantage had by the jury in facing the witnesses, and from the record determine whether or not the verdict is so plainly a miscarriage of justice as to call for a new trial."

In view of expert testimony concerning the desirability of administration of 100 percent oxygen and of placing the victim in intensive care with proper monitoring and other testimony indicating that the defendant did not meet this standard of care, the verdict was not against the great weight of the evidence.

Defendant next alleges that the trial court erred in allowing plaintiff's counsel, during final argument, to read to the jury from a medical textbook, a passage not previously in evidence relating to the standard of care to be applied.

During closing argument, plaintiff's counsel read

the following excerpt from a 1976 article by Dr.
Donald McDonald published in the British Medical
Journal:

"Emergency treatment of a patient suspected of car-
bon monoxide poisoning includes removal of the victim
from the source of poisoning, administration of 100
percent oxygen by tight fitting face mask and immedi-
ate transportation to a hospital where hyperbaric treat-
ment is available."

The reading was done in the context of impeach-
ing the testimony of Dr. Spitz, who had testified
that use of the hyperbaric chamber was a "fad"
and that he would not have recommended it for
treatment of Brian.

The trial judge twice indicated that only words
or passages which had already been read into
evidence could be read to the jury during closing
argument. The McDonald article, along with sev-
eral other articles, had been properly used by the
plaintiff to impeach Dr. Spitz's testimony earlier.
Dr. Spitz had recognized this article and stated
that he had used it in preparation for his testi-
mony. Dr. Spitz had been cross-examined at length
on the material in the article and expressed agree-
ment with its assertion that every patient exposed
to carbon monoxide should receive prompt and
efficient oxygen from a hyperbaric chamber where
available. However, the record does not indicate
that the exact sentence quoted during final argu-
ment had been read into evidence.

Before and after the passage in question was
read, two passages from other medical texts were
properly read into evidence. The first stated:

"Such patients should be given pure oxygen by mask
and treatment in a hyperbaric chamber if this is avail-
able."

The passage read after the McDonald passage stated:

"In a severe CO [carbon monoxide] poisoning with loss of consciousness, the treatment of choice is oxygen at Two Atmospheres of Pressure [a level administered by a hyperbaric chamber]."

Defendant's dispute is not with these two passages but with plaintiff's counsel's use of the sentence from the McDonald article in closing argument.

Michigan law regarding the admission of learned treatises into evidence is quite strict. In *Bivens v Detroit Osteopathic Hospital,* 77 Mich App 478; 258 NW2d 527 (1977), *rev'd* 403 Mich 820 (1978), this Court allowed a three-page passage to be read during closing argument (not during cross-examination for the purpose of impeachment). The *Bivens* Court admitted the textbook as substantive evidence and instructed the jurors that the textbook could be considered as such. Citing *Jones v Bloom,* 388 Mich 98; 200 NW2d 196 (1972), which allowed textbooks to be used for the purpose of impeaching an expert witness on cross-examination, the *Bivens* Court stated:

" 'We, therefore, hold that medical textbooks or other publications may be used to cross-examine expert witnesses if the expert recognizes the publication as authoritative or if the trial court takes judicial notice of the publication as authoritative.' " *Jones v Bloom, supra* at 118." *Bivens, supra,* 490.

As to the reading of the passage in the case before it, the *Bivens* Court concluded:

"We believe the trial court exceeded the authority

provided by *Jones.* The court's allowance of the text material as 'impeachment evidence' was clearly proper under *Jones.* However, when he provided the material might be allowed 'for whatever substantive value it may have', he exceeded the stated perimeters of *Jones* by giving effect to the *Jones* dicta as well. We believe this extension was error.

"Nevertheless, upon examining the record, we find that the effect of reading this section of the textbook was probably minimal." *Id.,* 491.

In a memorandum opinion reversing this Court, the Supreme Court stated:

"As we held in *Jones v Bloom,* 388 Mich 98 [200 NW2d 196] (1972), learned treatises are admissible for impeachment purposes. We declined to make learned treatises admissible as *substantive* evidence in the recently promulgated Michigan Rules of Evidence. Compare Federal Rule of Evidence 803(18). The trial judge thus erred by allowing plaintiff's counsel to read to the jury excerpts from a medical textbook. Given counsel's *extended references* to the textbook during his closing argument, we cannot agree with the Court of Appeals that the effect of this evidence 'was probably minimal'." 403 Mich 820-821. (Emphasis supplied.)

See, also, MRE 707, permitting use of learned treatises to be admitted "for impeachment purposes only".[1]

In the instant case, in contrast to the actions of the trial court in *Bivens,* the trial court did not admit the passage as substantive evidence but only for impeachment purposes and insisted that the

---

[1] "MRE 707. Use of Learned Treatises for Impeachment.

"To the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice, are admissible for impeachment purposes only."

material read had to have been read previously into evidence. As it happened, the excerpt which plaintiff's counsel proceeded to read was not in evidence; however, it was a very brief excerpt *of only one sentence* and did not constitute or come close to constituting the "extended references" condemned by the Supreme Court in *Bivens.* While the passage read from the McDonald article does tend to recommend a standard of care, and to that extent would be impermissible as substantive evidence, the passage was read in the context of plaintiff's impeachment of Dr. Spitz's testimony and the trial court did not intend or state that the excerpt was to be read for any reason other than impeachment. Furthermore, in view of the fact that this passage seems to restate the material of the two properly admitted passages, it appears to be clearly cumulative in nature.

The determination of whether the error in plaintiff's reading from a portion of an article not in evidence was prejudicial may be made according to the standards set forth in *Ilins v Burns,* 388 Mich 504, 510-511; 201 NW2d 624 (1972):

"The question then arises as to whether or not the error was harmless under GCR 1963, 529. A finding of *prejudicial* error depends on the circumstances of each case (3 Honigman & Hawkins, Michigan Court Rules Annotated [2d ed], Comments, p 228); the excessiveness or unfairness of the verdict *(Ford v Cheever,* 105 Mich 679 [63 NW 975 (1895)]; *McDonald v Champion Iron & Steel Co,* 140 Mich 401 [103 NW 829 (1905)]); the intent of counsel in introducing such evidence *(Cluett v Rosenthal,* 100 Mich 193 [58 NW 1009 (1894)]; *Nemet v Friedland,* 273 Mich 692 [263 NW 889 (1935)]); and whether the evidence went to the substantive issues of the case *(Burns v Kieley's Estate,* 242 Mich 668 [219 NW 743 (1928)]).

"Once prejudicial error is found, the cases call for

reversal regardless of whether the trial judge gave an instruction in an attempt to cure the error. *Potentially* prejudical error can be cured. Prejudical error, however, implies a conclusion that the substantial rights of the party were affected. Such error calls for reversal and new trial." (Footnote omitted, emphasis in original.)

Applying this standard, this Court does not find the claimed error to be sufficiently prejudicial to defendant's substantial rights even to warrant the final step of the above-cited analysis, especially in view of the fact that Dr. Spitz had recognized the article and had acknowledged reading it in his trial preparation.

Defendant's next issue on appeal involves a hypothetical question posed to one of defendant's expert witnesses during cross-examination. Defendant contends that it constituted error for the trial court to admit into evidence the hospital records of a subsequently treated patient whose treatment by defendant hospital formed the basis of plaintiff's hypothetical question.

The facts which lead to the rather complex basis for defendant's contention are as follows: during cross-examination, Dr. Spitz, expert witness for the defense, stated that he would not recommend use of a hyperbaric chamber for Brian, who was admitted to defendant hospital approximately two hours after he was exposed to carbon monoxide, because such treatment would have been useless and, in fact, harmful in Brian's case, too much time having elapsed since Brian's initial exposure to the fumes. Plaintiff's counsel then presented Dr. Spitz with a hypothetical fact situation regarding a carbon monoxide victim and asked him if he would recommend use of the chamber in that instance. Dr. Spitz said he would not. Plaintiff's counsel, out of the jury's presence, then proposed for admission

certain records of defendant hospital on which the hypothetical situation was based. The records, especially Exhibits 13-K and 34, related to the hospital's hyperbaric treatment of 17-year-old Kathleen Brown for carbon monoxide poisoning and to the patient's total cure, even though she had been transferred to defendant hospital over four hours after her arrival at Mt. Clemens Hospital. Plaintiff's counsel proposed the record as an admission against interest. Defense counsel objected because the hypothetical and the hospital record contained facts with respect to a patient at a later date in a "completely different circumstance". Defense counsel also objected to admission of the record as hearsay with respect to the history and diagnosis contained therein.

In the context of protracted argument, the trial court stated, "The contents is *[sic]* hearsay, but it is *[sic]* admitted into evidence everyday because it is an admission * * *". The court apparently meant that the information contained in the record was an admission against interest at the time made. The court explained:

"You see, at the time it was made, there was—there was no question involved by the usual kind of admission which when made tends to—how shall I say it, it is admitted into evidence because at the time it is made it tends to reflect adversely on oneself. This is not an admission in that sense. It is a series of events which tends to impeach the position of the defendant—is more properly phrased.

\* \* \*

"Now the only danger involved in all of this is that— if there is danger at all—is that this would be somehow taken, bearing on the standard of care. But that is cured, I hope, in a sense by the obvious fact that this occurred later than the treatment of Brian Sponenburgh.

"In effect, this is being introduced only to establish a question of scientific fact if we can put it that way.

\* \* \*

"Now the next thing is—now it is in evidence and he is *[sic]* given his opinion. I have admitted it on the grounds that it occurred in defendant's hospital. It does contradict his opinion."

More important to our determination of this issue is the fact that in the presence of the jury, before resting his case, plaintiff's counsel stated:

"Your Honor, in the absence of the jury, counsel for the Plaintiff and Defendant have entered into a stipulation regarding certain exhibits regarding this young lady, Kathleen Vera Brown, and it is stipulated between the parties or agreed between the parties that the material I used in my hypothetical question was actually [accurately] portrayed. And I am now going to read first from the Mt. Clemens General Hospital the relevant material as if it was being offered into evidence.

"This is Kathleen Vera Brown in the emergency. She arrived there at six a.m., that was November 1st, 1968; that she had a blood pressure of 100 over 50; pulse 120; and that she was given 100 percent oxygen while there; that she arrived at Wayne County General at 10:45 a.m. And that in addition to the material that has already been given to the jury as an exhibit, additionally to these materials, which are already in evidence, it is found that the pupils are equal and do react sluggishly to light.

"To make it clear to those of you who are not familiar, we are not actually giving these as evidence."

On appeal, defendant raises the same objections to admission of this record as were raised in the motion for new trial or judgment n.o.v. In denying that motion, the trial judge gave several reasons for the admissibility of the record in question. The

trial court stated that the record was admissible as a business record under MRE 803(6) and also as prior inconsistent conduct of defendant, and under MRE 407 as a subsequent remedial measure to rebut defendant's claim that such would be unfeasible and *because defendant stipulated at trial to the facts contained in the history.*

We shall first address the issue of whether defense counsel stipulated at trial to the disputed history contained in the hypothetical question, for our resolution of this issue will be dispositive of defendant's contention. Defendant, on appeal, alleges that the admissibility of the history and opinion or diagnosis contained in the records never was stipulated to by defendant, defendant only having stipulated to acts, events, transactions, and occurrences in the hospital record. (We here note that defendant's characterization of the stipulation as being only to acts, events, etc., without the history, would render the stipulation meaningless.) Defendant states that the history that Kathleen Brown, the patient in question, was found in a closed garage with three friends who were pronounced dead on arrival at Mt. Clemens Hospital was highly prejudicial in light of plaintiff's suggestion that Brown could have been revived by the hyperbaric chamber and sent home totally asymtomatic despite the unfavorable circumstances under which she was found. In this Court's opinion, this testimony also could have been viewed as supportive of Dr. Spitz's contention that because Brian, unlike Kathleen Brown, was in a comatose condition, administration of 100 percent oxygen in his case would have been futile.

The defendant normally has a heavy burden in asserting that a stipulation made in open court is other than what was stated in court:

"The litigant who so asserts to a stipulation freely entered into in open court carries a heavy burden of persuasion. Every presumption of judicial care, of professional competence, and of decretal stability is against the overthrow, in the appellate court, of such stipulation and of orders and decrees based thereon." *Wagner v Myers*, 355 Mich 62, 68; 93 NW2d 914 (1959).

See also *Meyer v Rosenbaum*, 71 Mich App 388; 248 NW2d 558 (1976).

In the instant case, defendant asserts that the record indicates that its stipulation was made *only to certain specific facts* in defendant's hypothetical question to Dr. Spitz and not to the history and diagnosis contained in the hypothetical question. We cannot agree with this strained reading of what appears to us to be a clear stipulation, freely offered.

Defendant argues that plaintiff's counsel's statement that "it is stipulated between the parties * * * that the material I used in my hypothetical question was [accurately] portrayed" cannot be read reasonably as meaning that defense counsel stipulated to all material in the hypothetical. We do not see how it can be read to mean otherwise.

When defendant's counsel vigorously resisted admission of the hospital records of Kathleen Brown, plaintiff's counsel sought a stipulation regarding certain facts contained in the Mt. Clemens Hospital record not contained in the Wayne County General record. The following colloquy occurred:

"*Mr. Koulouras [defense counsel]*: Let me ask this of counsel, if I may.

"What facts does he intend to prove by this document?

"*Mr. Charfoos [plaintiff's counsel]*: The same I gave in my hypothetical.

"*The Court:* But he wants to know.

"*Mr. Charfoos:* Roughly it starts with the time which is listed at six a.m. and goes through the vital signs, goes through the treatment that was rendered on emergency basis and the time of transfer.

"*Mr. Koulouras:* We will stipulate to those facts if the facts contained in the hypothetical are essentially correct."

The trial court concluded that defendant had stipulated to everything that happened to Kathleen Brown on the date in question, beginning with 6 a.m. and going through the time of transfer, including all facts in the plaintiff's hypothetical, and thus the stipulation included reference to the three companions who died of carbon monoxide poisoning. We agree. Although defendant contends that he believed plaintiff's counsel only was seeking to establish the specific items mentioned, it appears from the plain words of the stipulation and from the context in which it was offered that plaintiff's counsel was speaking of *all* facts in the record from the 6 a.m. reference to the time of transfer. Plaintiff's counsel had just said that he wished to establish the facts in his hypothetical and, when pressed for specifics, his answer indicated that he wanted everything from 6 a.m. to the time of transfer. The transfer record from Mt. Clemens clearly indicates the diagnosis and history at the time of transfer, and it strains the credulity of this Court to hear defendant argue that defendant's counsel was unaware of this when he stipulated to facts going *through* the time of transfer.

It must be further noted that oral arguments were heard on the question of the stipulation in the course of defendant's motion for a new trial. The trial court made its findings on this issue in a

written opinion. Because the trial court was able
to observe the demeanor of the attorneys at trial,
an advantage not afforded this Court, it is our
belief that the trial judge was in the better posi-
tion to determine the scope of the stipulation. See
*Wagner, supra.*

Additionally, the diagnosis of carbon monoxide
poisoning might be described more properly as a
physical condition than as a diagnosis. In *Osberry
v Watters,* 7 Mich App 258, 263; 151 NW2d 372
(1967), the Court stated that hospital records were
admissible despite the notations that the diagnosis
was whiplash of the neck because "[t]he four words
can scarcely be classified as a diagnosis and would
seem to fall in the classification of description of
physical condition mentioned in *Caccamos's Case*
(1944), 316 Mass 358, 362 (55 NE2d 614, 616)
* * *".

It is our view that the facts contained in the
hospital record, other than those relating to his-
tory and diagnosis, were admissible under the
business records exception to the hearsay rule,
MRE 803(6) as acts, transactions, occurrences, or
events which could be used to impeach Dr. Spitz's
testimony that hyperbaric treatment two hours
after a carbon monoxide victim has been exposed
to the gas would be futile, where defendant hospi-
tal did, in fact, render such treatment after four
hours. Underlying this holding is the assumption
that Dr. Spitz was an agent of Wayne County and
that he was not testifying as an independent ex-
pert. We believe that such assumption is justified
on the basis that Dr. Spitz was a salaried employee
of Wayne County and had not decided at the time
of trial whether to take his regular county salary
or an expert witness fee, the choice, apparently,
having been left to him.

The hospital records also were properly admitted, as the trial court noted, as admissions (by conduct) against interest and as prior inconsistent conduct. 31A CJS, Evidence, § 291, pp 739-741, states:

"An admission may be made by conduct as well as orally or in writing. Thus, as a general rule, any act or conduct on the part of a party which may fairly be interpreted as an admission against interest on a material issue may be shown in evidence against him. Where a party on the trial of an action advances contentions which are inconsistent with his prior conduct with respect to the matter in controversy, such prior conduct may be shown as being in the nature of an admission.

"Evidence of this character takes a wide range and may be received for example where the matter in controversy is the ownership, value, or control of property; the existence of a relative mental state, such as assent or lack thereof, intent, motive, knowledge, or recklessness; or the existence of such matters as claim, disclaimer, fraud, probable cause, and ratification." (Footnotes omitted.)

Because the hypothetical question and the hospital records were not identical, the records should not have been used to impeach Dr. Spitz's answers to the hypothetical question. The hypothetical question as stated by plaintiff's counsel involved an unconscious victim, whereas Kathleen Brown's hospital records indicate that she was semicomatose upon admission to Wayne County General. Defendant properly did object on the grounds of lack of identity between the hypothetical question and the hospital records. Dr. Spitz himself indicated the differences between the two. Because the hospital records were admissible for other purposes, however, no prejudice requiring reversal

occurred because of this lack of identity. Furthermore, it remains our abiding conviction that the admission of the disputed material was the result of the stipulation between defendant's and plaintiff's counsels.

Defendant raises two more claims of error, which we deem merit only brief discussion.

Defendant first argues that the trial judge erred in admitting into evidence a newspaper clipping for the purpose of cross-examining the hospital administrator. This issue concerns an article which appeared in a Detroit newspaper in June of 1966 showing a photograph of a hyperbaric chamber and containing the following caption:

"Taking part in the unveiling of a $10,000 hyperbaric chamber for treatment of poison victims in the new Wayne Glas Memorial Intensive Care Unit at Wayne County General Hospital are Dr. H. J. Wells, Hospital Superintendent; Dr. Glas' Widow and W. G. Grant, Chairman of the County Board of Institutions.

"The chamber was installed as a memorial to Dr. Glas, former chief of surgery of the hospital, who was shot to death October 2 by an off-duty plant guard."

Dr. Emma Conklin, administrator of Wayne County General Hospital, testified on direct examination that the hyperbaric chamber was purchased by the hospital for the purpose of research and investigation. On cross-examination, plaintiff's counsel marked and offered Exhibit 28, the previously described newspaper clipping.

Defendant objected to introduction of the contents of the caption, stating that it was not attributable to the defendant and had no probative value. Defense counsel did not object to introduction of the picture "to show there was available a

'hyperbaric chamber' ''. The trial court admitted the exhibit, stating to the jury:

"Ladies and gentlemen, we have admitted into evidence Exhibit No. 28. Well, the portion that's material is a photograph and the caption under it appearing in a newspaper and I just wanted to tell you that *this is offered for the purpose of demonstrating that it appeared in the newspaper,* and not for the purpose of showing that the caption the information contained in the caption emanated from Wayne County General Hospital. As of the present there is no evidence of that.

"But as I say, *just for the purpose of showing that it appeared in the newspaper.*" (Emphasis supplied.)

Because the trial court did not admit the article as proof of the contents therein, the court did not impermissibly admit hearsay evidence under MRE 801(c). It is our opinion that the trial court did not abuse its discretion in admitting the article for the limited purpose of showing that it appeared in the paper.

The final issue which we shall address is defendant's contention that the trial court improperly denied defendant's request for the court to preview the video deposition of plaintiff's expert, Dr. William Hulet. Defendant claims that this denial prevented it from interposing certain substantive objections to this deposition.

On August 30, 1977, the defendant filed a request for the viewing of the video tape deposition by Dr. Hulet pursuant to GCR 1963, 315.6(2). The trial started on the scheduled trial date six days later, September 6, 1977. GCR 315.6(2) provides:

"(2) Before any visual deposition shall be introduced in evidence, either party may request that the trial judge view the visual deposition for the purpose of making rulings on objections to all or any portion of the

deposition, whether such objections were made at the deposition recording or not. *Failure to request such viewing at least 10 days before trial shall constitute waiver of objections.* Where the trial judge has presided at the taking of the deposition and has ruled upon objections, the provisions of this subrule shall not apply." (Emphasis supplied.)

After the unedited video deposition had been seen by the jury, the defendant asked to make a record, and the court stated that the basis for letting the entire video deposition into evidence was (1) the lateness of the request under the court rule, (2) that there was no written transcript for the court to review, and (3) that it would have inconvenienced the jury due to the delay involved in previewing the tape.

The defendant contends that the video deposition contained some prejudicial testimony, as well as comments by attorneys present at the deposition. However, the record does not suggest that the deposition was so manifestly prejudicial to the defendant as to deny it a fair trial. Furthermore, it is just as plausible to surmise that some of the comments regarding Brian's history of glue-sniffing and his prior suicide attempt could have prejudiced the plaintiff's case in the minds of some jurors. The trial court did not err in admitting the unedited deposition testimony for the reasons stated by the trial court, primarily the lateness of the defendant's request for court review of the videotape.

The defendant further claims that GCR 315.6 is in conflict with GCR 302.5 which states:

"Subject to the provisions of subrule 308.3, objection may be made at the trial or hearing to receiving in evidence any deposition or part thereof for any reason

which would require the exclusion of the evidence if the witness were then present and testifying."

We disagree with defendant's contention. The interests of judicial convenience and efficiency may be different when video depositions, as opposed to written depositions, are at issue. Defense counsel was free to provide a written transcript of Dr. Hulet's deposition prior to admission of the deposition in evidence. Problems of delay which may arise when a court is asked to view a taped deposition, after which the tape must be edited before presentation to the jury, validly may require a time limit after which a party waives objections to the deposition. Absent such prejudice as would deny the defendant a fair trial, failure to comply with the court rule waives any objection to the deposition testimony. Because no manifest injustice is present here, reversal is not required.

The defendant's final contention, that GCR 315.6(2) cannot be performed in Wayne County Circuit Court because parties do not know who the trial judge will be ten days before trial, is without merit. The rule requires only the timely filing of the request, after which the trial judge, before trial, will view the video deposition. In the instant case, there is no question but that timely filing was not made.

In our opinion, the crux of this case was whether whatever damage had occurred to Brian Sponenburgh in the garage was irreversible, defendant's position, or whether there was a possibility that certain treatment could have improved Brian Sponenburgh's condition, the position asserted by plaintiff. Essentially, this was a question of fact for the jury. Each side's contention was vigorously argued in a prolonged trial, the transcript of which covers over 1600 pages and is encompassed

in ten volumes. In reading the record, it is our belief that both plaintiff and defendant were given the best assistance our adversarial system could afford them. It was the conclusion of the jury that plaintiff's position was the most tenable.

A trial of the magnitude of that in the instant case cannot be totally free of error. However, our detailed study of the briefs, records, and transcript in this complex case leaves us with the firm conviction that none of the errors complained of by defendant was sufficiently prejudicial to require reversal.

Affirmed. Costs to appellee.